Filed 8/2/12

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S081918 |
| v. | ) | |
| | ) | |
| KENNETH McKINZIE, | ) | |
| | ) | Ventura County |
| Defendant and Appellant. | ) | Super. Ct. No. CR40930 |
| _____ | ) | |

A jury convicted defendant Kenneth McKinzie of first degree murder (Pen. Code, §§ 187, subd. (a), 189) and found true the robbery-murder and burglary-murder special circumstance allegations (Pen. Code, § 190.2, subd. (a)(17); all undesignated statutory references hereafter are to this code). The jury also convicted defendant of first degree robbery (§§ 211, 212.5, subd. (a)), first degree burglary (§§ 459, 460, subd. (a)), carjacking (§ 215, subd. (a)), and kidnapping for robbery (§ 209, subd. (b)), finding as to these counts that the victim was 65 years old or older (§ 667.9, subd. (a)). The jury additionally convicted defendant of two counts of second degree burglary (§§ 459, 460, subd. (b)). The jury deadlocked during the penalty phase, and the trial court declared a mistrial. A second jury was empanelled and, after a new penalty phase, returned a verdict of death. The trial court imposed a sentence of death for the murder. With respect to the remaining counts, the trial court imposed a prison term of life for the kidnapping count plus one year for the elderly victim enhancement, the upper term of nine years for carjacking plus one year for the elderly victim enhancement, and one-third the midterm

1

each for first degree burglary (16 months) and the two second degree burglary counts (eight months each), running these terms consecutively and staying the remaining terms. This appeal is automatic. (Cal. Const., art. VI, § 11, subd. (a); § 1239, subd. (b).) We conclude, and the Attorney General concedes, that the judgment should be modified to stay the sentence on the carjacking count. As modified, we affirm the death judgment.

**I.**

A. Guilt Phase

1. Prosecution Case

At approximately 9:00 a.m. on December 22, 1995, two men discovered the body of 73-year-old Ruth Avril in a drainage ditch at the end of Arnold Road in Oxnard, an agricultural area near the beach. Avril's body was partially submerged in one-and-a-half to two feet of water. The body had no identification, and there were no signs that rigor mortis or livor mortis (blood settling) had begun. Dr. Janice Frank, assistant medical examiner for Ventura County, performed an autopsy, which revealed numerous lacerations and blunt force injuries throughout Avril's body, particularly in the head, face, and neck areas. Avril had a laceration near her left temple and a group of lacerations near her left eye, which could have been caused by a single blow or multiple blows. Avril's right eye was swollen shut, and she also had a "continuous bruise that involved the whole right side of [her] face" as well as a deep laceration on her right cheek that went to the bone. Frank saw petechial hemorrhaging inside of Avril's eyes, which could have been caused by compression of blood vessels in the neck that prevented blood from leaving the head. This type of compression, as well as bruising on Avril's neck and deep neck hemorrhaging, was consistent with manual strangulation. Avril also had suffered subdural hemorrhaging around the brain consistent with blunt force trauma. Frank, who had examined Avril's Ford Taurus, opined that some of Avril's head injuries could have been caused by the edge of the Taurus's trunk lid hitting her head. Frank concluded that the cause of death was "blunt force injuries to the head and manual

2

strangulation." Based upon Avril's body temperature, the presence of rigor mortis or livor mortis, and fluidity of the eye, Frank estimated the time of death to be between 9:00 or 10:00 p.m. on December 21, 1995, and 2:00 or 3:00 a.m. on December 22, 1995.

At the time of her death, Avril lived at 410 East Dollie Street in Oxnard in a three-unit apartment building that she owned. She lived on the top floor and rented out the other two units, one of them to Maria Aragon. Aragon saw Avril daily as Aragon came home from work. Avril owned a black Ford Taurus, which she parked in her garage. Avril routinely left her garage door open until she went to close it at around 11:00 p.m. Aragon last saw Avril at the apartment shortly after noon on December 21, 1995. Aragon eventually reported Avril missing on January 1, 1996. On that date, Oxnard Police Officer Steven Funk accompanied Aragon to Avril's apartment. The front door to Avril's apartment was unlocked and showed no signs of forced entry. Funk and Aragon entered the apartment to find it had been ransacked. The living room had a stereo cabinet, but there was no stereo inside. A Christmas tree had been put up, but there were no presents underneath. The contents of Avril's purse had been dumped onto the living room floor. In one bedroom, the dresser drawers had been pulled out, and empty gift boxes were on the floor.

Edwin Jones, senior criminalist for the Ventura County Sheriff's Department, examined Avril's Ford Taurus, which was found in an Oxnard parking lot. Jones found bloodstains and blood spatters inside the Taurus's trunk. Testing of the blood for DNA revealed that the blood came from Avril. The presence of "blood swipes" inside the trunk lid led Jones to conclude that Avril had been placed in the trunk while still alive. Jones also analyzed blood evidence found in Avril's garage and examined photos of the garage. There was a large area of blood near the center of the garage. Blood spatters appeared to have originated from this area onto the nearby wall and further into the garage. Based upon the blood spatter evidence, Jones concluded that Avril had been struck at least twice inside the garage.

3

Defendant lived with his girlfriend, Peggy Garner, and her three sons in an apartment at 421 Helena Way, across an alley from Avril's building. Prior to Christmas 1995, defendant and one of Garner's sons had helped Avril carry her Christmas tree into her apartment.

The preliminary hearing testimony of defendant's friend Ralph Gladney, who died before trial, was read to the jury as follows. Late one night, a couple of days before Christmas 1995, defendant went to Gladney's house and asked if Gladney knew anyone who needed a camera and stated he needed money because he was "broke." Defendant later inquired of Gladney whether Gladney knew of a woman who could help defendant use an ATM card that belonged to defendant's girlfriend. The following day, Gladney went with defendant to a motel room, where defendant told Gladney he "may have killed someone." Defendant explained he had attacked a "nice" woman who lived on Dollie Street whom he knew and "usually helps." Defendant waited for her outside of her garage, then attacked her inside the garage. Defendant "kept hitting her and hitting her" because she would not stop yelling, and he also choked her. Defendant then put the woman in the trunk of her car and "drove her off somewhere in Malibu." Defendant explained to Gladney that he attacked the woman because he needed money for Christmas presents for his children.

Theresa Johnson had known defendant since 1990, and defendant had helped her move a few days prior to Christmas 1995. Late at night, a day after Johnson's move, defendant, whose hands appeared swollen, arrived at Johnson's apartment and asked where he could get drugs. Defendant later showed Johnson a stack of credit cards and an ATM card along with a driver's license depicting an older Caucasian woman. Defendant asked Johnson if she knew how to use the ATM card, and she replied she did. They left in a car Johnson identified at trial as Avril's and drove to a market where Johnson used the ATM machine inside the store. Defendant had given Johnson the PIN number, which was written on a piece of paper, and Johnson used the card twice, withdrawing about

4

$100 each time. They then drove to a convenience store where Johnson again used the ATM card and gave the money to defendant. Defendant gave Johnson $160 and dropped her off at her apartment. Defendant returned a short while later with drugs, and the two of them smoked rock cocaine. At some point, defendant told Johnson that he might have killed someone. Defendant described a woman who lived down the alley from him whom he had seen earlier that day. He had taken her Christmas tree into her residence. Defendant stated that the woman turned off her lights at the same time every night and that he waited for her in the garage to rob her. He hit her with his fists and tried to knock her out, but he could not. As she screamed, defendant continued to hit her, then eventually put her in the trunk of her car and hit her in the head with the trunk lid. Defendant drove her around as she continued to scream from the trunk. Defendant ended up on a back road, pulled the woman out of the trunk, hit her, and threw her into a ditch while she was still alive. Defendant admitted the ATM card they had used belonged to this woman. After this conversation, defendant put on some sunglasses, Johnson donned a wig, and the two drove to a bank to use the ATM again, this time without success. Defendant dropped Johnson off and later returned in a taxi, stating he had "ditched" Avril's car.

Either later the same day or the next day, defendant arrived at Johnson's apartment with an "arm[ful]" of wrapped presents that he said he had obtained from Avril's residence. They opened the presents, which included a doll which defendant gave to Johnson's daughter and some shirts which defendant kept. Defendant later returned to Johnson's apartment with stereo equipment and a VCR. Johnson phoned her sister's boyfriend, C.J. Brewer, who bought the stereo equipment from defendant for $150.

In late December 1995, defendant went to the residence of Erania McClelland, the mother of defendant's daughter Kenisha, and gave to Kenisha a box containing a camera, a small television, and a shirt. Defendant also gave Kenisha a pink robe. McClelland eventually gave the camera to a police investigator. Film from the camera was developed

5

and revealed a photo of Avril and photos of her neighbors. At trial, Avril's daughter-in-law identified the pink robe as the same one she had purchased for Avril as a Christmas present in 1995.

2. Defense Case

Donald Thomas lived two blocks from Avril and met her when he was about seven or eight years old and began doing odd jobs for her. He had known her for about 11 to 12 years prior to her death. In 1991, Thomas installed some stereo equipment in Avril's apartment and, about three months prior to her death, helped her move it. Thomas last saw Avril on December 20 or 21, 1995, when she waved to him as he was playing cards in the garage of a friend's house across the alley from Avril's building. Thomas learned of Avril's death approximately a month later when police detectives talked with him. The detectives also told Thomas that Avril had been beaten to death, and he later conveyed this to his friend. Without prompting from the detectives, Thomas inquired of the detectives whether Avril's stereo had been stolen because he had heard that defendant had a stereo for sale and Thomas was "suspicious" of defendant. Thomas said he knew Avril's body had been dumped off of Arnold Road because that fact had been mentioned in the newspaper. Thomas denied telling an ex-girlfriend that he went into an apartment to steal a television and VCR but "panicked" when the occupant awoke. Thomas also denied any involvement in Avril's death or taking anything from her apartment. Thomas acknowledged having moved to Oregon a few days after defendant's arrest in January 1997 but said that was merely a coincidence.

Oxnard Police Detective Michael Palmieri spoke with Thomas on the phone on January 3, 1996. Thomas indicated that the Black Mafia gang had been responsible for various burglaries and robberies in the area, and he opined that the gang might have been involved in Avril's death. Thomas also asked if Avril's stereo had been stolen and offered to identify it if it was recovered. In a later interview, Thomas reiterated his

6

concern over the Black Mafia gang and also named defendant as a possible suspect, though Thomas did not specify why he suspected defendant.

James Young testified that he was in Thomas's bedroom with Thomas's girlfriend when Thomas described a burglary. Thomas said he went to an apartment "across from the garage" where they would "hang out" and obtained a television and VCR, when someone woke up and things got "bad."

Dr. Ronald Siegel, a psychopharmacologist, testified generally regarding the effects of cocaine on the body. Cocaine might make a person more paranoid and may adversely affect long-term memory.

Defendant testified that he had known Avril as he occasionally helped her with various tasks. Around Christmas 1995, defendant and his ex-girlfriend's son carried Avril's Christmas tree into her apartment and helped her set it up. Sometime afterward, but in the same timeframe, defendant saw Thomas in a car with some other men. Thomas showed defendant a VCR and some credit cards, and asked if he wanted to buy them. Defendant offered to sell the VCR for him, and Thomas let defendant take the car he had. Defendant also offered to take the credit cards to find out how they could be used. Defendant drove the car to Gladney's residence and sold him the VCR for $40, keeping $10 and giving the remainder to Thomas. After selling the VCR, defendant drove to Johnson's house to see if she could use the cards. Defendant and Johnson smoked some cocaine, and Johnson agreed to use the cards. They drove to a grocery store and then a convenience store where Johnson used the cards to withdraw money. After the two returned to Johnson's house and smoked some more drugs, defendant left to give Thomas a share of the money. When defendant met up with Thomas, Thomas showed defendant a stereo and asked if defendant could sell it. Thomas then told defendant that he had obtained "the stuff" from Avril and "she got beat." Thomas claimed "they" put Avril's body in the trunk of her car and drove her to Malibu. Thomas eventually gave defendant a stereo, bathrobe, camera, and a stuffed animal. Defendant drove the items to Johnson's

7

apartment. Because he "couldn't deal with it" anymore, he told Johnson the items came from Avril, who had been beaten and her body dumped. At some point, defendant figured out the car given to him by Thomas was stolen because he had seen Avril's photo on one of the credit cards, and he decided to drive the car to a motel parking lot. Defendant later spoke to Thomas, who elaborated that "[t]hey waited on her and things got bad." Defendant eventually gave the camera and bathrobe to his daughter, and Johnson helped him sell the stereo. Defendant denied killing or beating Avril.

B. Penalty Phase

    1. Prosecution Case

As noted, the first jury deadlocked at the penalty phase, and the penalty phase was retried to a second jury. Part of the evidence at the second penalty phase trial consisted of recounting the crime facts in a manner that mirrored the guilt phase as recounted above. In addition to this evidence, the following was presented at the second penalty phase trial.

About a month before the start of the second penalty phase trial, Ventura County Sheriff's Deputy Anthony Bellissimo was transporting defendant from his cell in preparation for a jail visit when another inmate asked defendant how his case was going. Defendant responded that he was going to see his psychologist and that "the D.A. didn't know this yet, but he was going to plead guilty, that he had killed a 73-year-old lady and that he needed to take responsibility for his actions" so he could "go with dignity if that was the case." After his jail visit, defendant asked Bellissimo not to say anything because " '[i]t will mess up [his] case.' "

Avril's daughter-in-law, Janet, testified that Avril had worked for General Telephone until she retired when she was 67 years old. Avril had lived alone after her divorce in 1945 or 1946 and had lived in Oxnard as long as Janet had known her. Avril had one son, Richard, and Janet and Richard came to visit every Christmas.

8

Aragon testified that she had known Avril for 18 years prior to her death and that they met when Aragon rented a unit in Avril's building. Avril was "[v]ery independent" and active with gardening, baking, and crafts. She was "very patriotic," had a flag outside her building, and sent cards to her friends for birthdays and Christmas. Several days after she had last seen Avril, Aragon was contacted by the police and identified photos of Avril.

McClelland testified that she was defendant's girlfriend between 1975 and 1987 and that they had a daughter together. Their relationship was "on and off," and they had "violent confrontations" about twice a year. McClelland suffered some "painstaking injuries" as a result of these confrontations, including black eyes and bruises. In one incident, defendant put a gun in McClelland's mouth. In January 1988, after their relationship had ended, defendant confronted McClelland at a bar, demanded money, then beat her when she did not comply until she gave him $10. On cross-examination, McClelland agreed that she and defendant were "mutually involved" in fighting. During McClelland's pregnancy, defendant treated her "very well." McClelland said defendant was a good, attentive father but acknowledged that defendant was incarcerated for most of the time their daughter was growing up.

In January 1990, defendant's sister Darlene was living with her parents and her two sons. One day, defendant came to the house, they fought, and he hit her and her mother. She told police that defendant had grabbed her by the neck and thrown her across the room. Darlene told a police investigator that in one incident, defendant had tried to burn his sister Wylene with an iron when she "said something" about defendant's girlfriend Garner. In another incident, defendant had hit Darlene and pulled her hair. Darlene also told the investigator that defendant had been physically violent with her and her sister at least 20 times, although she said at trial that she had exaggerated the claim.

Garner was defendant's girlfriend from 1986 until his arrest in the instant case, and they had a son together. In May 1995, defendant came to her apartment late at night,

9

broke her window, demanded to be let in, and accused Garner of being with another man. Garner denied that defendant hit her on this occasion. Garner claimed defendant was good to their child and her sons; they would eat together, and defendant wrote letters from jail. But Garner admitted having written a letter to defendant's parole officer in October 1996 in which she said she wanted defendant to have only one-hour supervised visits, out of concern for her son's safety.

One of Garner's sons, Donnie Bullard, testified that defendant took the place of his father and that defendant never hit him. With respect to the May 1995 incident, defendant entered their apartment, Garner swung an ashtray at defendant, and Bullard and his brother Ronald Thompson physically separated them. Defendant only grabbed Garner in self-defense. Thompson testified that although he saw defendant and Garner struggle a little, he did not see defendant hit her. Defendant never hit Thompson, they did a lot of activities and sports together, and Thompson loved him like a father. Oxnard Police Officer Felice Epps responded to a domestic violence call in May 1995. Garner told Epps that defendant had broken a window of her apartment and that when Garner let him in, he ran inside and accused her of being with a man. Defendant then grabbed her by the neck and pulled her arm. Thompson told Epps that he saw defendant and Garner struggling and that he eventually wrestled defendant away from Garner.

Maria Garcia testified that, in June 1983, she and her sister went to an Oxnard bank where she cashed a check for $1,000. As Garcia returned to her car, defendant ran up to her, hit her in the face, and tried to take her purse. Garcia pushed defendant, and he ran off. Garcia was afraid for a couple of years after the attack.

In June 1994, Jon Snyder worked as an orderly at the Ventura County Jail commissary. One day, Snyder called out the name of Joel Epperson, and defendant approached with a nonstandard armband to claim Epperson's commissary items. Suspicious, Snyder did not give defendant the items and reported the incident to his supervisor. Epperson testified that he received his commissary items the next day.

Defendant approached Epperson, stated he had "picked up a felony charge" for trying to get Epperson's commissary, and demanded Epperson give him half of his items or he would kill him. Epperson obliged.

The parties stipulated that defendant had been convicted of four prior felonies: grand theft auto in 1978, attempted burglary in 1979, attempted robbery in 1983, and possession of a controlled substance in 1994.

  2. Defense Case

According to defendant's father, defendant was a "good little boy until he [grew] up [a] little bit," and he taught defendant how to do construction work. They went fishing, defendant did work around the house, and he was respectful. Defendant's mother described defendant as "smart" and said he was "very good" about helping around the house. She conceded defendant had previously struck her, but he apologized thereafter. A couple of weeks before her testimony, defendant confided in her that he had killed Avril.

Defendant testified and admitted killing Avril and having lied at the first trial. He decided to tell the truth to defense counsel and his parents, and he felt relieved. Defendant recounted he had learning problems in school and began skipping class. He regretted not staying in school and getting help. Defendant started using drugs as a teenager when he stopped attending school and smoked PCP almost daily. He used cocaine after a state prison term, and he began to smoke it every day. Defendant explained the circumstances that led to him to strike his sister Darlene. Darlene had disobeyed their mother and "got smart" with defendant, and he threw her against a wall while she also hit him. Defendant helped raise Garner's sons, and he was proud of them. Defendant admitted trying to take McClelland's purse, and he pleaded guilty and served a prison term for that offense. With respect to the present offenses, defendant recounted that he had no money to buy his family Christmas presents. He was smoking outside, thinking about how to get money, when he saw Avril's car and decided to rob her,

11

without a plan. Defendant approached the garage next door, removed his shoes, put his socks on his hands, and waited. He grabbed Avril when she turned off the garage lights. Avril bit him, and he hit her multiple times until she was unconscious. He did not plan to kill her, and he just "acted stupid." Defendant carried Avril to the trunk of Avril's Ford Taurus, placed her inside, and slammed the trunk lid on her head as she started to regain consciousness. Defendant had blood on him, so he drove to his parents' house and changed clothes. Defendant then drove around and eventually decided to leave Avril on Arnold Road. Defendant helped Avril out of the trunk, and she slipped and fell into a ditch. Defendant denied strangling Avril. Defendant did not realize Avril would die in the ditch, and he just wanted to get away from her. He then recounted how he sold a VCR to Gladney and talked to Johnson about Avril's ATM and credit cards. Defendant told Johnson about what he had done because he felt bad about it.

## II.

A. Jury Selection

1. *Wheeler/Batson*

Defendant contends that the prosecutor's use of a peremptory challenge against a single African-American prospective juror was improperly based upon race. "The prosecution's use of peremptory challenges to remove prospective jurors based on group bias, such as race or ethnicity, violates a defendant's right to trial by a jury drawn from a representative cross-section of the community under article I, section 16 of the California Constitution and his right to equal protection under the Fourteenth Amendment to the United States Constitution." (*People v. Blacksher* (2011) 52 Cal.4th 769, 801 (*Blacksher*); see *Batson v. Kentucky* (1986) 476 U.S. 79, 89; *People v. Wheeler* (1978) 22 Cal.3d 258, 276-277.) "First, the defendant must make out a prima facie case 'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.' [Citation.] Second, once the defendant has made out a prima facie case, the 'burden shifts to the State to explain adequately the racial exclusion' by offering

12

permissible race-neutral justifications for the strikes. [Citations.] Third, '[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination.' [Citation.]" (*Johnson v. California* (2005) 545 U.S. 162, 168, fn. omitted; see *People v. Thomas* (2011) 51 Cal.4th 449, 473 (*Thomas*).)

Before the final phase of the selection process for the first jury, defense counsel raised a concern that "[t]here are very, very few black jurors in this panel" and requested that the prosecution be required to justify the exercise of a peremptory challenge against any African-American prospective juror because "if we wait until there's a systemic exclusion, there won't be any left." Defense counsel estimated that there were "three, possibly four" African-American jurors in a jury pool of 72, and the estimate was not challenged. The trial court noted that the proportion was "entirely normal in this county, the way the population is made up . . . ." The trial court denied the defense request, but the parties agreed they would approach the bench if the prosecution decided to peremptorily challenge an African-American prospective juror.

The prosecutor later indicated he would be exercising a peremptory challenge against Prospective Juror K.S., the only African-American person then on the petit jury. Defense counsel made a *Wheeler* motion, noting that K.S. indicated during individual questioning that he could be fair, that he had previously applied to work as a police officer, and that he had marked "8" on a scale of 1 to 10 that he was in favor of capital punishment (with 10 indicating strongly in favor and 1 strongly opposed). After examining K.S.'s jury questionnaire, the trial court found that the defense had not made a prima facie case of discrimination, but "in an abundance of caution," the trial court asked the prosecutor to state his reasons for the challenge. The prosecutor explained K.S. had been convicted of domestic violence recently (in 1997), and the prosecution's penalty phase evidence would include defendant's acts of domestic violence against various family members. The prosecutor also indicated K.S.'s "lifestyle does not particularly

13

thrill me," stating that K.S. indicated he spent "his spare time playing basketball, darts and dancing, so he doesn't seem to have a whole lot of depth in areas that I would deem to be important." The prosecutor noted K.S. also indicated he had had "a bad experience with the police" regarding a traffic stop. Finally, the prosecutor suggested K.S. might "have a bad attitude" because he "kind of swaggered into the court" and "sat there with . . . his chin on his palm of his hand, resting his elbow on the arm of the chair, which seemed to be kind of a disrespectful attitude toward the whole process and the seriousness of this trial." The trial court commented that, had it found a prima facie case, "I'd be finding those reasons adequate and highlighted by [K.S.]'s own brush with the law."

Defendant argues that the prosecutor's reasons for challenging K.S. were pretextual. He notes that the prosecutor did not challenge several jurors who had similar hobbies, nor did the prosecutor challenge at least two jurors who previously had had negative police contacts. Initially, the trial court did not find a prima facie case of discriminatory use of a peremptory challenge. However, because "the trial court requested the prosecutor's reasons for the peremptory challenges and ruled on the ultimate question of intentional discrimination," "whether defendant established a prima facie case is moot." (*People v. Lenix* (2008) 44 Cal.4th 602, 613, fn. 8 (*Lenix*).) "We thus proceed to determine whether the trial court erred in finding that the prosecutor's reasons for exercising his peremptory challenge . . . did not show purposeful racial discrimination." (*Thomas, supra,* 51 Cal.4th at p. 474; see *People v. Mills* (2010) 48 Cal.4th 158, 174 [noting the case was "a first stage/third stage *Batson* hybrid" and stating "we express no opinion on whether defense counsel established a prima facie case of discrimination and instead skip to *Batson*'s third stage to evaluate the prosecutor's reasons for dismissing six African-American prospective jurors"] (*Mills*).)

"[T]he rule in *Batson* provides an opportunity to the prosecutor to give the reason for striking the juror, and it requires the judge to assess the plausibility of that reason in

14

light of all evidence with a bearing on it." (*Miller-El v. Dretke* (2005) 545 U.S. 231, 251-252.) "[E]vidence of comparative juror analysis must be considered in the trial court and even for the first time on appeal if relied upon by the defendant and the record is adequate to permit the urged comparisons." (*Lenix, supra,* 44 Cal.4th at p. 622; see *Miller-El, supra,* 545 U.S. at p. 241 ["If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step."].) "[C]omparative juror analysis is but one form of circumstantial evidence that is relevant, but not necessarily dispositive, on the issue of intentional discrimination." (*Lenix, supra,* 44 Cal.4th at p. 622; see *People v. Lomax* (2010) 49 Cal.4th 530, 572.) "[A] retrospective comparison of jurors based on a cold appellate record may be very misleading when alleged similarities were not raised at trial. In that situation, an appellate court must be mindful that an exploration of the alleged similarities at the time of trial might have shown that the jurors in question were not really comparable." (*Snyder v. Louisiana* (2008) 552 U.S. 472, 483.)

As the trial court here observed, K.S.'s "own brush with the law" rendered him materially dissimilar to the other seated jurors, irrespective of any similarities in hobbies. "[S]pecific bias may be properly inferred from the juror's prior arrest or conviction . . . ." (*People v. Allen* (1989) 212 Cal.App.3d 306, 312.) When the prosecutor questioned him about his prior domestic violence conviction and inquired whether he felt he had been "treated fairly by the criminal justice system," K.S. responded, "I'm not really sure [how] to answer that question. I don't know." When asked if his prosecution left "a bad taste in [his] mouth for the criminal justice system," K.S. responded that the "financial burden" the process placed on him "sort of hurt" his "family situation." Notwithstanding K.S.'s assurance that he could be fair to both sides, the prosecutor could have surmised otherwise based upon K.S.'s responses to questions concerning his prior conviction. (See *People v. Ledesma* (2006) 39 Cal.4th 641, 679 [challenged juror's prior convictions for

15

brandishing a weapon and driving under the influence distinguished him from other jurors with traffic citations].)  Further, given the proposed penalty phase evidence regarding defendant's prior acts of domestic violence, the prosecutor could have reasonably concluded that K.S. might be sympathetic to defendant.  (See *People v. Watson* (2008) 43 Cal.4th 652, 675 [substantial evidence supported the trial court's finding of no discrimination where the challenged juror's "voir dire answers . . . suggested she might be overly sympathetic to an individual with defendant's background"]; *People v. Stanley* (2006) 39 Cal.4th 913, 940 [finding sympathy for defendant a valid race-neutral reason for peremptory challenge] (*Stanley*).)

Even if the prosecutor's assertions that K.S. lacked "depth" based upon his hobbies and had a "bad attitude" based upon his "swagger" were relatively weak bases for challenging K.S., the prosecutor's first stated concern regarding the prospective juror — his recent domestic violence conviction — unquestionably constituted a valid, race-neutral ground for the challenge.  In sum, the trial court could reasonably find the totality of the record supported a conclusion the prosecutor's challenge was not based upon group bias.

### 2. Prosecutorial Misconduct

Defendant argues that the prosecutor committed prejudicial misconduct under the state and federal Constitutions by "leaking" a story to the press during jury selection.  As noted, the first jury deadlocked during the penalty phase, and the penalty phase was retried before a second jury.  The trial court conducted *Hovey* voir dire of prospective jurors, a procedure "by which prospective jurors are asked individually about their views concerning the death penalty and may be excused if they would not vote to impose the death penalty under any circumstances."  (*People v. Jennings* (2010) 50 Cal.4th 616, 687; see *Hovey v. Superior Court* (1980) 28 Cal.3d 1, 69-82.)  During *Hovey* voir dire of the second jury, defense counsel Willard Wiksell raised an issue outside the presence of prospective jurors.  Wiksell indicated that defendant was "getting a little irritated"

16

because the prosecutors had repeatedly referred to defendant as "that man" in front of the prospective jurors, which defendant believed was demeaning. The trial court agreed that the word "that" and "a little bit of tone" made the reference "a little unduly pointed" and told the prosecution the court would "prefer to either hear Mr. McKinzie's name or some phrasing that isn't 'that person,' 'that man.' " Deputy District Attorney Donald Glynn said that he did not believe the phrase was insulting and that defendant did not "deserve[] . . . that type of consideration" since he "did kill a 70 year old . . . ." The trial court replied, "this is not the time to be pointing fingers and in that light," and asked the prosecutor "to change the phrasing that you have been using most of the time."

During examination of the next prospective juror, Deputy District Attorney Cheryl Morgan referred to defendant as "this man." After that juror was examined and another juror was excused for cause, defendant stated twice, "I'll tear his head off." After the parties examined another juror, all counsel met with the trial court in chambers outside of defendant's presence. The trial court indicated that due to defendant's "anger over the recent events in the courtroom," the bailiffs had recommended defendant be shackled. Defense counsel objected, noting that counsel had calmed defendant down and that he had made no threats before those at issue here. The trial court made a record of what occurred: "As one juror was . . . leaving and we were waiting for the next one to come in, Mr. McKinzie, in a voice audible to me at the bench, at counsel table there was used some kind of a phrase about socking Mr. Glynn, and 'I have got nothing to lose.' And then there were some very aggressive comments apparently made in the lockup area and during the break." Defense counsel again indicated that they had calmed defendant down, that defendant did not feel he created the situation, and that he was becoming more angry based upon some comments between the prosecution and defense counsel. The trial court asked Glynn, "why shouldn't you be ordered to refer to [defendant] either as 'the Defendant' or 'Mr. McKinzie'?" Glynn said that he had done nothing wrong and that "if the Court orders me . . . to show respect to this murderer, . . . I think you have

17

gone too far." While finding the prosecution was not "intentionally trying to aggravate [defendant] or denigrate him," the trial court ordered the prosecution "not to use 'that man' or 'person,' " finding this to be a "practical solution [] so we can get through the second half of *Hovey*." Glynn objected to the ruling and continued to argue against it, stating that "[t]his man who has killed a 73-year-old lady is getting undue deference because it is upsetting him . . . ." The trial court decided not to shackle defendant but warned him security was paramount. The next morning, Glynn informed the trial court that he had learned of defendant's comment, "I am going to rip his head off," and said he was concerned about his safety. Glynn asked that defendant be shackled. The trial court denied the request, noting that security had been increased.

On Monday, April 26, 1999, the prosecution filed a "Third Amended Notice of Proposed Evidence in Aggravation," which added as proposed aggravating evidence, "Evidence of a threat of force or violence against Donald C. Glynn on 4-22-99." The defense asked the trial court for a tentative ruling on the admissibility of this evidence. Defense counsel argued there was a "tremendous [Evidence Code] 352 problem" and expressed concerns about Glynn having to testify. The trial court indicated that it was tentatively inclined to exclude the evidence because the court was not convinced defendant had made a criminal threat within the meaning of Penal Code section 422. Glynn indicated that he would like a hearing at which the bailiff could testify regarding what defendant had said. The trial court obliged and scheduled a hearing on the issue for Friday, April 30, 1999.

On the next day, Tuesday, April 27, 1999, an article appeared in the Ventura County Star newspaper entitled, "Prosecutor to use courtroom threat against murderer." The article reported that the jury at the new penalty phase trial "will know Kenneth McKinzie said he'd like to rip lawyer's head off" and also reported that defendant was overheard "in court saying he'd like to punch the prosecutor, and 'I've got nothing to lose.' " According to the article, "Kenneth McKinzie's threat in court last week led

18

prosecutor Donald Glynn to file court papers Monday saying he will use it to bolster the prosecution's case that the defendant is a violent person who should be put to death." Citing "court transcripts," the article described how defendant became angered at being referred to as "that man," recounted the in-chambers discussion about courtroom security, and noted that an extra bailiff was added on Monday.

Defense counsel Wiksell brought the article to the court's attention that morning and accused Glynn of "filing this frivolous motion so that he could get before the jury what he knew could never have been before the jury, given the rules of recusal, and it is outrageous." Wiksell indicated that a defense investigator saw the author of the article, Amy Bentley, come into the courtroom on April 26 and ask to see the bailiff. The bailiff, in turn, spoke with Glynn, who handed the bailiff some transcripts, which the bailiff gave to Bentley. Wiksell argued that "there must have been some communication" between Glynn and the reporter. After examining some more prospective jurors, the trial court returned to the issue and asked Glynn about it. Glynn said that he "did not know that this was a closed courtroom" and that when reporter Bentley "asked if anything's going on in the trial," he "directed her to the appropriate day of the transcript" and allowed her to borrow his transcripts. The bailiff confirmed that Bentley stated Glynn "had some papers for her to view" and that she handed Bentley two volumes of transcripts. The trial court said it would postpone ruling on the defense request to halt jury selection for a week to allow the taint of the article to dissipate, questioning the effectiveness of such a delay. Wiksell conceded that he did not "think there's been any actual showing . . . of prejudice to Mr. McKinzie" but argued there should be some sanction for the "deliberate dissemination of material with an intent to prejudice" defendant. Glynn again asserted that a "reporter called [him] up and asked [him] if anything . . . was going on in the McKinzie case" and that he "directed her to read a transcript of an open court proceeding for a particular day and said [he] was going to file an amended notice of factors in aggravation." Glynn said, "we all know how boring *Hovey* is, but I directed her to

19

something that was happening that had a certain interest to it," and "she requested the material and wrote an article." Glynn asserted he had done nothing unethical. The trial court commented that Glynn "should have known better regarding calling the reporters to a situation that is very iffy at best, whether it is coming into evidence" and that "it showed very poor judgment . . . to call her attention to this at this delicate stage of the case" where "this is clearly an issue that you knew was up in the air," and "as it was presented to the reporter, it appears as if it is a done deal, that it is coming into evidence." Glynn later "clarif[ied]" that he, in fact, contacted Bentley first and that she had returned his phone call. The trial court commented, "So in other words, you felt the need to have this matter appear in the newspaper, is that it?" to which Glynn responded that he "frequently" spoke with Bentley and merely directed her to a portion of the transcript.

Later, after the parties discussed the admissibility of defendant's statements, Wiksell argued that Glynn's conduct constituted misconduct and that the trial court "should do something" such as "find there was misconduct and say it on the record." The trial court ultimately excluded the evidence of defendant's statements, finding that the statements did not constitute a criminal threat and that there was "danger of confusion [of] the jury and undue consumption of time" within the meaning of Evidence Code section 352. The trial court additionally commented that it would have excluded the evidence "as a sanction for the People's action in orchestrating the newspaper article . . . ." In response to Glynn's inquiries, the trial court commented at length that it believed Glynn had acted improperly in seeking to publicize defendant's statements when the admissibility of the evidence was still in question and when jurors were still being selected and might be exposed to the erroneous news article.

At the defense's request, the trial court admonished the prospective jurors that an article had been published in the Ventura County Star that contained "a major inaccuracy" regarding "what evidence is likely to be in the penalty phase of this case" and that "it's crucial that it be disregarded if you know what was printed there." The trial

20

court told prospective jurors that they should inform the court if they saw or read the article, and the court again emphasized that "there's an affirmative, direct, substantial inaccuracy in the article . . . ." Of the jurors and alternates actually seated, only Alternate Juror No. 2 "got partway into" the article before realizing it was about the case and stopped reading. Alternate Juror No. 2 agreed the article was not part of the case and said he could ignore it. Juror No. 11 said that although her husband and a friend told her there had been an article about the case, they did not reveal the substance of the article, and she never read it.

Defendant argues that Glynn committed misconduct by "trying this case in the media" and attempting to place before prospective jurors potentially inadmissible evidence and to generate negative publicity. He claims he was deprived of a fair penalty trial under the state and federal Constitutions. " '[A]t the penalty phase a prosecutor commits misconduct under the federal standard by engaging in conduct that renders the trial so unfair as to constitute a denial of due process.' [Citations.] Under state law, it constitutes reversible misconduct for the prosecutor to employ deceptive or reprehensible methods to persuade the court or the jury [citation], when 'there is a reasonable possibility that without such misconduct, an outcome more favorable to the defendant would have resulted.' [Citations.]" (*People v. Williams* (2010) 49 Cal.4th 405, 464 (*Williams*); see *People v. Dykes* (2009) 46 Cal.4th 731, 786 (*Dykes*).) "The focus of the inquiry is on the effect of the prosecutor's action on the defendant, not on the intent or bad faith of the prosecutor." (*People v. Hamilton* (2009) 45 Cal.4th 863, 920; see *People v. Hill* (1998) 17 Cal.4th 800, 822-823 (*Hill*).)

In support of his claim, defendant requests judicial notice of the superior court case files in *People v. Holland* (Super. Ct. Ventura County, 1998, No. CR39530), another capital case in which Glynn was the prosecutor and Wiksell was defense counsel. Noting that the jury in *Holland* chose to impose a life term, defendant contends that this shows Glynn was motivated to avoid another "loss" by leaking information about the instant

21

case to the press.  "Although a court may judicially notice a variety of matters (Evid. Code, § 450 et seq.), only *relevant* material may be noticed."  (*Mangini v. R. J. Reynolds Tobacco Co.* (1994) 7 Cal.4th 1057, 1063, overruled on another ground in *In re Tobacco Cases II* (2007) 41 Cal.4th 1257, 1276; see *People v. Curl* (2009) 46 Cal.4th 339, 360, fn. 16.)  As noted, Glynn's subjective motivations are not relevant to defendant's prosecutorial misconduct claim; we focus instead "on the effect of the prosecutor's action on the defendant."  (*People v. Hamilton*, *supra*, 45 Cal.4th at p. 920.)  Accordingly, we deny this judicial notice request.

Defendant points to our decision in *People v. Brommel* (1961) 56 Cal.2d 629 (overruled on another ground in *People v. Cahill* (1993) 5 Cal.4th 478, 509), which reversed the defendant's murder conviction due to the admission into evidence of an involuntary confession.  In *Brommel*, "the district attorney released to the press copies of the confessions and admissions of defendant before they were admitted into evidence by the court."  (*Brommel, supra,* 56 Cal.2d at p. 636.)  *Brommel* noted the "obvious impropriety of this conduct" and said:  "Prosecuting officers owe a public duty of fairness to the accused as well as to the People, and they should avoid the danger of prejudicing jurors and prospective jurors by giving material to news-disseminating agencies which may be inflammatory or improperly prejudicial to defendant's rights."  (*Ibid*.)

Defendant is correct that prosecutors "are held to an elevated standard of conduct" "because of the unique function he or she performs in representing the interests, and in exercising the sovereign power, of the state."  (*Hill, supra,* 17 Cal.4th at pp. 819-820; see *Berger v. United States* (1935) 295 U.S. 78, 88 ["It is as much [the prosecutor's] duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one."]; *Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 709 ["Prosecutors are public fiduciaries.  They are servants of the People, obliged to pursue impartially in each case the interests of justice and of the community as a whole."].)  Whatever the motivation for Glynn's disclosure, there seems little doubt that

his conduct posed a real risk of tainting the jury pool by disseminating potentially prejudicial and inadmissible evidence. (*In re Martin* (1987) 44 Cal.3d 1, 35 [a prosecution investigator's act of arresting a defense witness outside the courtroom in front of the press and other defense witnesses constituted misconduct].) As the trial court observed, Glynn "should have known that the admissibility of this evidence was highly questionable and would be strongly contested," and his actions "injected highly questionable evidence into the media at a rather tender moment in terms of the jury selection . . . ." Whether intended to influence the trial court's pending decision regarding the admissibility of defendant's statements or to put before prospective jurors potentially prejudicial and inadmissible evidence regarding defendant's character, Glynn's conduct derogated from his duty to act as an impartial public fiduciary sworn to promote the even-handed administration of justice.

However, Glynn's misconduct was not prejudicial to defendant under either federal or state law. "In order to be entitled to relief under state law, defendant must show that the challenged conduct raised a reasonable likelihood of a more favorable verdict. In order to be entitled to relief under federal law, defendant must show that the challenged conduct was not harmless beyond a reasonable doubt." (*Blacksher, supra,* 52 Cal.4th at p. 828, fn. 35.) Defendant cannot make such a showing on the present record. The trial court acted reasonably in handling the situation by excluding the disputed evidence, making a complete record of the circumstances, and making appropriate inquiries regarding the impact of the newspaper article upon the jury pool. As noted, only Alternate Juror No. 2 read the article in question "partway," and none of the other seated jurors saw the article. Alternate Juror No. 2 ultimately did not participate in deliberations here. Although defendant suggests that the article irreparably tainted the jury pool, the trial court strongly admonished the prospective jurors that the article was inaccurate and should not be considered. In addition, after the trial court said that anyone

23

who read the article should come forward, only four prospective jurors (other than Alternate Juror No. 2) indicated they had read the article, and they were all excused.

"This case is not the first in which pretrial publicity may create an issue with respect to ensuring a fair trial for the defendant, nor is it the first in which one side or the other may be inordinately responsible for that publicity." (*Hollywood v. Superior Court* (2008) 43 Cal.4th 721, 733.) As *Hollywood* observed, such matters regarding potential publicity should be "handled during voir dire through the close questioning of individual prospective jurors," which is exactly what occurred here. (*Ibid*.) Indeed, defense counsel acknowledged that defendant had not been prejudiced and that he was not asking for a mistrial or to start jury selection anew because "quite frankly, I think those things are . . . not proportional." In sum, we find no showing of prejudice from the prosecutor's misconduct warranting reversal here.

3. Challenges for Cause of Prospective Jurors

Defendant contends that the trial court denied his rights to a fair trial and due process under the federal Constitution by excusing for cause nine prospective jurors based upon their inability to impose the death penalty. He also argues that the trial court should have excluded a juror for having a bias in favor of the death penalty. As discussed below, defendant's claims fail under applicable precedents.

Although "a criminal defendant has the right to an impartial jury drawn from a venire that has not been tilted in favor of capital punishment by selective prosecutorial challenges for cause," "the State has a strong interest in having jurors who are able to apply capital punishment within the framework state law prescribes." (*Uttecht v. Brown* (2007) 551 U.S. 1, 9.) "[T]o balance these interests, a juror who is substantially impaired in his or her ability to impose the death penalty under the state-law framework can be excused for cause; but if the juror is not substantially impaired, removal for cause is impermissible." (*Ibid*.; see *Wainwright v. Witt* (1985) 469 U.S. 412, 424.) " ' " ' A prospective juror is properly excluded if he or she is unable to conscientiously consider

24

all of the sentencing alternatives, including the death penalty where appropriate.' [Citation.]" [Citation.]  In addition, " '[o]n appeal, we will uphold the trial court's ruling if it is fairly supported by the record, accepting as binding the trial court's determination as to the prospective juror's true state of mind when the prospective juror has made statements that are conflicting or ambiguous.' [Citations.]" ' [Citation.]" [Citation.]' [Citation.]  When the juror has not made conflicting or equivocal statements regarding his or her ability to impose either a death sentence or one of life in prison without the possibility of parole, the court's ruling will be upheld if supported by substantial evidence." (*People v. Pearson* (2012) 53 Cal.4th 306, 327-328.)  "The trial court is in the best position to determine the potential juror's true state of mind because it has observed firsthand the prospective juror's demeanor and verbal responses." (*People v. Clark* (2011) 52 Cal.4th 856, 895 (*Clark*); see *People v. Garcia* (2011) 52 Cal.4th 706, 743 (*Garcia*); see also *Uttecht, supra,* 551 U.S. at p. 9 ["Deference to the trial court is appropriate because it is in a position to assess the demeanor of the venire, and of the individuals who compose it, a factor of critical importance in assessing the attitude and qualifications of potential jurors."].)

(a) Jurors Excused for Cause

(i) Prospective Juror F.T.

At the time of jury selection, Prospective Juror F.T. was a 62-year-old office assistant from Ojai.  When asked in her jury questionnaire about her general feelings regarding the death penalty, she responded she was "not sure," "[i]t depends on the circumstance in each case," and "[t]here have been case[s] where I thought it right."  F.T. said she had no strong views for or against the death penalty that would cause her to vote for or against that punishment regardless of the evidence, she could keep an open mind about the proper penalty, she could follow the instructions, she was not a member of any group advocating for increased or decreased use of the death penalty, and she held no religious beliefs that would make it difficult to sit in judgment of another.  Asked on a

scale of 1 to 10 whether she felt there should be a death penalty law, with 10 indicating strongly in favor of such a law and 1 reflecting strong opposition, F.T. circled "7." When asked if she held any religious or moral beliefs that would make it difficult to sit as a juror in a capital case, she responded, "Yes, it would be a difficult thing to do."

During voir dire, the trial court inquired of F.T. whether she could "be fair in this matter as to the penalty," to which she responded, "I don't know that I could make a decision that would go one way or the other," and "I don't know whether I'd be comfortable . . . to go with the death penalty, to be honest with you." When asked if she had marked a "7" with respect to whether she was in favor of the death penalty, F.T. stated, "I don't know that I could do it, though." Upon questioning by defense counsel, F.T. stated her belief that sometimes death was "a necessary punishment" and that she could listen to the evidence and make a decision based upon that. When asked if she could "consider the death penalty in this type of case," F.T. responded in part, "I don't know if I personally, as myself, could make a decision like that. I don't know what my feelings would be about having made a decision that so impacted someone's life and death." She agreed with defense counsel, however, that "under the right circumstances," she could vote for death. The prosecutor asked F.T. if she fell into the category of persons who supported the death penalty in the abstract but could not themselves impose it. F.T. agreed, stating, "That's, I'm sure, where I am. I don't know if I could do it. I believe that it needs to be done sometimes. I just don't know if I am capable of doing it." However, F.T. indicated she would "certainly try" though she was unsure if she could. When pressed by the prosecutor, F.T. reiterated that it would be "extremely difficult" for her to impose the death penalty and that "I don't know if I could do it, but if I had to say yes or no, if you really needed a yes or no right this very moment, I would say no, I couldn't do it." Defense counsel then elicited from F.T. that she could consider both penalties and that she would not automatically vote for life, though she again stated she did not know if she could impose the death penalty.

26

Although defense counsel argued F.T. was "where she's supposed to be" and that she could consider both penalties, the trial court granted the prosecution's challenge for cause, commenting, "I feel that she cannot assure us in any way that she could ever vote for [death] and that she said similar things in the questionnaire as well."

Under our precedents, substantial evidence supported the trial court's determination. Although she indicated in her jury questionnaire that she was in favor of the death penalty, F.T. repeatedly expressed doubts during voir dire regarding whether she could personally impose the penalty, stating at various points, "I don't know that I could do it," "I don't know if I personally . . . could make a decision like that," and "I just don't know if I am capable of doing it." While F.T. stated she would "certainly try" to keep an open mind, she again expressed doubts about her ability to do so, ultimately agreeing with the prosecutor that she fell within the class of persons who supported the death penalty but could not themselves impose it. "Those answers, coupled with the court's observations of [F.T.'s] responses and demeanor, could create a ' "definite impression" ' that her 'views would substantially impair the performance of her duties.' [Citation.]" (*Clark, supra,* 52 Cal.4th at p. 898 [upholding removal of prospective juror for cause where, although she favored the death penalty, she stated she would " 'feel a little uncomfortable' " and " 'have a hard time' " voting for death and she " 'probably would not' " set aside her beliefs]; see *People v. Bivert* (2011) 52 Cal.4th 96, 110-112 [upholding removal for cause of prospective juror who could not personally impose the death penalty] (*Bivert*); *People v. Tate* (2010) 49 Cal.4th 635, 674 [upholding removal for cause of prospective juror who "harbored very serious doubts whether, if seated on a capital jury, she could ever personally vote to impose the death penalty"] (*Tate*).) Although F.T.'s assertion that she would have found it "difficult" to vote for the death penalty would have been insufficient, standing alone, to conclude her views would substantially impair her performance as a juror (*People v. Wilson* (2008) 44 Cal.4th 758, 786; *People v. Stewart* (2004) 33 Cal.4th 425, 446), answers on her jury questionnaire,

27

coupled with her voir dire responses and the trial court's observations of her demeanor on the stand, comprised substantial evidence supporting the trial court's finding that her ability to serve as a capital juror was impaired.

(ii) Prospective Juror E.S.T.

Prospective Juror E.S.T. was an 82-year-old retired longshoreman living in Ventura. When asked in his jury questionnaire about his general feelings regarding the death penalty, E.S.T. wrote "[d]on't believe." Asked what types of crimes deserved the death penalty, E.S.T. replied, "[s]erial killer." E.S.T. said his views about the death penalty had changed over time "[w]hen a death penalty man is found to be innocent." E.S.T. indicated he had no strong views for or against the death penalty that would cause him to vote for or against that punishment regardless of the evidence, that he could keep an open mind about the proper penalty, he could follow the instructions, he was not a member of any group advocating for increased or decreased use of the death penalty, and he held no religious beliefs that would make it difficult to sit in judgment of another. On a scale of 1 to 10, E.S.T. marked "8" regarding whether he believed there should be a death penalty law.

The trial court inquired during voir dire what E.S.T. meant by "[d]on't believe" when asked about his feelings regarding the death penalty. E.S.T. explained: "It would have to be extreme cases. The only thing I could say is like murder and child molestation, serial, that I firmly believe in the death penalty." When asked about cases not involving children or multiple murders, E.S.T. stated he would do "[his] best" to "analyze it through" but "[i]t would be pretty hard to ask for the death penalty . . . if it wasn't an extreme case." Upon defense counsel's questioning, E.S.T. agreed that some murderers should be executed and some sent to prison for life depending on "what plays out in court," that remorse may be a factor to consider, and that he could keep an open mind regarding penalty. When asked by the prosecutor whether he could ever impose the death penalty for a single murder not involving a child, E.S.T. stated he "could under

28

certain circumstances" and he would "have to hear the case" but he was "basically" against the death penalty except in "extreme cases." E.S.T. agreed with the prosecutor that "in most instances, [he] would not impose the death penalty for a single murder" and "for a single murder, [he] would be leaning toward imposing life without parole." Defense counsel attempted to clarify if E.S.T. would never vote for death in a single murder case, to which E.S.T. responded "it would be kind of hard, yes." Defense counsel submitted the issue without argument, and the trial court granted the prosecution's challenge for cause without comment.

Our precedents compel the conclusion that the trial court did not err in excusing E.S.T. Although he expressed support for the death penalty in his jury questionnaire, E.S.T. suggested during voir dire that the death penalty was appropriate only for an "extreme case," which he characterized as one involving a serial killer or a murder of a child involving molestation. He later reiterated that he was "basically" opposed to the death penalty for all but "extreme cases." "Although [the prospective juror] indicated [he] could impose the death penalty in specified, particularly extreme cases, [his] hypothetical examples presented more egregious facts than those involved in the present case. [Citations.] [His] examples were not analogous to the circumstances of the murder[] at issue in the proceedings before [him]." (*People v. Bradford* (1997) 15 Cal.4th 1229, 1320 (*Bradford*).) E.S.T.'s view that he would be "leaning toward imposing life without parole" in a single-murder case might not, by itself, disqualify him from serving on a capital jury. But "[t]o the extent that [the prospective juror's] answers left any doubt about his inability to impartially determine the appropriate penalty in this case, . . . we will defer to the trial court's resolution of that uncertainty, given that his answers were at the least conflicting and equivocal, and could be viewed as indicating he would be substantially impaired in discharging his duty as a juror." (*People v. Riggs* (2008) 44 Cal.4th 248, 285, fn. omitted.)

29

(iii) Prospective Juror F.R.

Prospective Juror F.R. was a 44-year-old clerk who lived in Simi Valley. She indicated in her jury questionnaire that she had "no feelings one way or the other" about the death penalty. F.R. said she had no strong views for or against the death penalty that would cause her to vote for or against that punishment regardless of the evidence, that she could keep an open mind about the proper penalty, she could follow the instructions, she was not a member of any group advocating for increased or decreased use of the death penalty, and she held no religious beliefs that would make it difficult to sit in judgment of another. Asked on a scale of 1 to 10 whether she felt there should be a death penalty law, with 10 indicating strongly in favor of such a law and 1 reflecting strong opposition, F.T. circled "5."

When questioned by the trial court, F.R. said she was "[s]till undecided" whether she "would be able to make a decision on that," referring to the death penalty. When asked about circling "5" for the question regarding whether she believed there should be a death penalty law, F.R. stated, "Sometimes I agree with the death penalty and other times I don't," but she would "probably vote against it" if it was presented at the ballot. The trial court asked if F.R. would have trouble applying the death penalty law, to which she responded, "if it were a heinous crime or something really — even then I would probably have a hard time." F.R. described the decision as "frightening." F.R. agreed with defense counsel that she was "wide open on either death or life without parole for the appropriate crime . . . ." She also agreed that she would have an open mind, listen to the evidence, and vote for the appropriate punishment based upon the evidence. The prosecutor asked what F.R. envisioned as being an appropriate case for the death penalty, to which she responded, "someone like Jeffrey Dahmer, ate people, killed people," and "[s]erial killer." When asked if she could impose the death penalty against someone who had killed one victim, F.R. responded she did not know and that she had not heard the evidence. The prosecutor inquired whether F.R. was a "strong enough person to impose

30

the death penalty on the Defendant over here," and she responded, "I would not want to. I would not want to be put in that position." When asked if she fell into the category of people who supported the death penalty in the abstract but could not personally impose it, F.R. stated, "It all depends on the crime. I don't — maybe. In this situation I probably couldn't do it." She agreed with the prosecutor that she would not want the responsibility of imposing death and that "given the choice between the death penalty and life without parole, because of [her] feelings [she] would probably vote for life without parole." Defense counsel then posited a scenario wherein a defendant raped three women and also killed the last victim. Counsel inquired whether F.R. could consider the death penalty in that scenario even though there was only one victim; she responded she could. Before reexamination by the prosecutor, F.R. began to cry and acknowledged the questioning had upset her. Upon questioning, F.R. reiterated that if she had a choice, she would "rather not make the decision," but she asserted she "could vote for death" though she would not want to.

At this point, the trial court asked F.R. if she could explain why she was so upset. F.R. stated she did not want to be in the position of "talking about a human life" and asked to be excused. F.R. further stated, "it is a real hard decision to make," she "would not want to sentence somebody . . . to death," and she did not have enough information about the case to make a decision. The trial court explained she would receive evidence later and she was not expected to make a decision right now, to which F.R. responded, "I think I can vote fairly." The trial court indicated it was inclined to deny a challenge for cause but heard argument from counsel. The prosecutor argued F.R. was "teary-eyed throughout most of her examination" and "equivocated throughout" about her ability to impose the death penalty. Defense counsel argued that F.R. did not express in her questionnaire opposition to the death penalty and that once she understood that she was not expected to make a decision now, she indicated she could impose death. The prosecutor countered that F.R. had "waffled back and forth" and that her inability to talk

31

about the death penalty without crying indicated she could not impose the death penalty. The trial court granted the challenge for cause. Although noting her questionnaire answers were "somewhat neutral," the trial court was "impressed by her body language and the tears even just talking about it," and found "she is somebody that would have an extremely hard time ever voting for the death penalty."

Again, the trial court did not err under our precedents. Although F.R. indicated in her jury questionnaire that she had no strong views about the death penalty, she expressed doubts during voir dire as to whether she could impose the penalty, described as "frightening" the prospect of having to make such a decision, said she "would not want to be put in that position," suggested she "probably couldn't do it," and agreed with the prosecutor that she did not want the responsibility of making such a decision. In addition to these statements, F.R. was visibly upset and crying about being questioned regarding her views. "Visible emotion and nervousness are factors a trial court properly may consider in evaluating a juror's demeanor, which is highly relevant to a trial court's ultimate determination" whether to excuse a juror for cause. (*Clark, supra,* 52 Cal.4th at pp. 897-898.) Although "[i]t is true that the mere expression by a prospective juror that he or she anticipates that a juror's duties will be difficult is not by itself grounds for discharging a juror," the prospective juror here "expressed great reluctance in undertaking her duties under the particular circumstance, and such reluctance, 'taken into account with the juror's hesitancy, vocal inflection, and demeanor, can justify a trial court's conclusion regarding the juror's mental state that the juror's views would " 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " ' [Citation.]" (*People v. Bunyard* (2009) 45 Cal.4th 836, 845-846.) In light of F.R.'s equivocal statements and her demeanor, the trial court's determination here was supported by substantial evidence despite F.R.'s assurance that she could "vote fairly." (*Clark, supra,* 52 Cal.4th at p. 897 ["the court was entitled to

find those assurances were severely undercut by [the prospective juror's] demeanor and his hesitant, inconsistent, and equivocal responses"].)

(iv) Prospective Juror R.H.

Prospective Juror R.H. was 33 years old, lived in Ventura, and worked as a technical support person. On his jury questionnaire, in response to a question asking for his general feelings regarding the death penalty, R.H. wrote "It[']s wrong!" and "I don't feel we have a right to put someone to death." When asked if the death penalty served any purpose, R.H. replied, "It makes a strong statement for the media, but makes Americans look like animals around the world." When asked what types of crimes warranted the death penalty, R.H. responded, "The assassination of the President only." However, R.H. maintained that he did not have strong feelings that would make him always vote against the death penalty, stating, "None of my convictions are very strong" and "it would be hard but not impossible" to impose the death penalty. When asked to rate on a scale of 1 to 10 whether he favored a death penalty law, R.H. circled "2."

During voir dire, R.H. said that he could be fair and that although he generally opposed the death penalty, he would vote for it if it was on the ballot and he would "not have a problem voting for it" as a juror if the rest of the jury voted for death. When the trial court asked R.H. if he could vote for death irrespective of the views of other jurors, R.H. indicated he was unsure how to answer but eventually expressed his belief that he could "weigh decisions both ways" and that he was "kind of like middle of the road." When defense counsel asked why R.H. believed it was not impossible for him to impose the death penalty, R.H. responded it would depend on the situation, giving the example of "Jeffrey Dahmer cutting people up" and "it is just not somebody being murdered" but "somebody hunting, like an animal." When asked by the prosecutor what types of situations warranted the death penalty, R.H. stated, "like people who just have gone beyond the normal human realm" and "gone completely overboard and just kind of animals" like Jeffrey Dahmer. When asked if he could vote for death in a case of "a

33

single murder of nobody of great importance," R.H. replied, "probably not, if it was like an eye-for-an-eye-type of thing." The prosecutor stated defendant here had been convicted of murder, carjacking, and robbery but had killed only a single person, and inquired whether R.H. could impose the death penalty in such a case, to which he replied, "[p]robably not, no." Finally, R.H. agreed with defense counsel that he could consider and impose both death and life without parole. The trial court granted a challenge for cause, concluding that "both in the questionnaire and the questioning [R.H.] indicated that his categories are so narrow that this case could never fit in it."

Under our precedents, substantial evidence supported the trial court's determination. "Although [the prospective juror] stated that [he] might be willing to consider the death penalty in certain very narrow circumstances, [he] gave as an example the Jeffrey Dahmer case, a case with facts far removed from those here." (*People v. Lewis* (2008) 43 Cal.4th 415, 487, fn. omitted (*Lewis*).) While R.H. stated as a general proposition that he could impose the death penalty notwithstanding his personal view that the death penalty was "wrong," he confirmed during voir dire that he "probably" could not impose the death penalty in the case of a single murder that did not involve the President and "if it was like an eye-for-an-eye type of thing." "Under such circumstances, we accept the trial court's implied determination that" the prospective juror's "views on the death penalty would have prevented or substantially impaired [his] performance of the duties required of a juror in a capital case." (*People v. Carey* (2007) 41 Cal.4th 109, 125 [removal for cause of prospective juror supported by substantial evidence where she indicated she would not impose the death penalty for a single murder] (*Carey*).)

(v) Prospective Juror R.C.

Prospective Juror R.C. lived in Ventura, was 44 years old, and worked as a supervisor at a department store. When asked in her jury questionnaire about her general feelings regarding the death penalty, R.C. wrote, "Before I knew what was involved in

34

this case, I was for the death penalty, but now for me to decide the fate of someone's life might be different in this manner" and "depends on evidence." When asked if the death penalty served any purpose, R.C. responded, "an eye for an eye." R.C. indicated she had no strong views for or against the death penalty that would cause her to vote for or against that punishment regardless of the evidence, that she could keep an open mind about the proper penalty, she could follow the instructions, and she was not a member of any group advocating for increased or decreased use of the death penalty. Asked on a scale of 1 to 10 whether she felt there should be a death penalty law, R.C. circled "8." She checked "yes" in regard to questions asking if she held religious or moral beliefs that would make it difficult to judge another or sit as a juror in a capital case, although she wrote, "I feel I could sit and listen open minded."

During voir dire, R.C. said that she had not made up her mind about the proper penalty here and that she could apply the law, although she commented that "when you read about it and when you see it on TV it is a whole different matter. But when you are put in this situation it is a different outlook." The prosecutor asked R.C. to explain her questionnaire statement that she might have a difficult time judging another. She reiterated that "hearing things on TV" or reading about cases was different than "sitting now, what would you do to decide . . . what to do with somebody's life," but she maintained that she was "open-minded." When asked if she was strong enough to impose the death penalty on another, R.C. replied, "[p]robably not in that case." The prosecutor inquired whether she fell into the category of persons who supported the death penalty but could not impose it themselves, and R.C. responded affirmatively. The trial court asked for clarification, and R.C. reiterated that even if she believed the death penalty was appropriate, "I don't know personally I could." Upon defense counsel's questioning, R.C. agreed that she was "open to listening to both sides" and could base her decision on the evidence. Defense counsel declined the trial court's invitation to argue the point, and the trial court excused R.C. for cause without comment.

The trial court could reasonably conclude on this record that R.C. was not capable of imposing the death penalty. On at least three occasions, R.C. expressed doubts regarding her ability to personally impose the death penalty, and those doubts sufficiently supported the trial court's determination under our precedents. (See *Bivert, supra,* 52 Cal.4th at pp. 110-112; *People v. Solomon* (2010) 49 Cal.4th 792, 835-836 (*Solomon*); *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 48-49.)

(vi) Prospective Juror D.K.

Prospective Juror D.K. was a 61-year-old retired analyst living in Thousand Oaks. D.K. wrote in her jury questionnaire that she generally opposed the death penalty and that she did not believe the death penalty served any purpose. In response to an inquiry about what crimes merited the death penalty, she wrote "none." D.K. also indicated she had a strong view against the death penalty such that she would always vote against death, commenting, "cannot take another person's life." She reiterated this view twice more in explaining that she belonged to a religion that opposed the death penalty and that she would not be able to change her vote during deliberations. When asked to rate her support for the death penalty on a scale of 1 to 10, D.K. circled "2."

The trial court asked during voir dire if D.K. could ever vote for death, to which she responded "maybe" and explained that "[i]t would have to be a tremendous, heinously . . . demented crime . . . [t]o the point where I felt there was no salvation of rehabilitation . . . ." When asked for clarification, D.K. explained, "The crime would have to be so outrageous and so indignant . . . to the point where I would feel there was no salvation for this individual." Defense counsel elicited from D.K. that she could be fair to both sides and could consider the death penalty. When asked by the prosecutor if she still opposed the death penalty, D.K. responded, "somebody is going to have to do an awful lot of talking to convince me to go the other way." The prosecutor asked why she put "none" for crimes that warranted the death penalty, and D.K. replied she "couldn't think of anything bad enough." The prosecutor pointed out that D.K. stated in her

36

questionnaire that her views were so strong that she would always vote against death, and D.K. stated, "in my conversation now it is obvious that I would vote for the death penalty, but it would have to be extreme circumstances." When the prosecutor observed that D.K. several times stated in her questionnaire that she could not take another's life, she acknowledged that "[defendant's] life is in [her] hands now" and "[i]f I decide that he should have the death penalty, I have basically taken his life." D.K. also acknowledged she was part of a religion that opposed the death penalty but denied that she would never change her mind during jury deliberations, stating, "it is going to take an awful lot of convincing right now" because of her "nonbelief in the death penalty." D.K. agreed with defense counsel that she could follow the law and impose the death penalty even if she disagreed with it, although she reiterated that it "has to be really extreme." When defense counsel expressed a concern that D.K. had set a standard for death "so high no one could ever meet it," D.K. responded in relevant part that she was in "favor of the death penalty only in exceptional cases" and "my standard for exceptional cases is not so high that it could not be proven to me at all." The prosecutor asked for an example of a case that warranted the death penalty, and D.K. cited "the children who bombed and shot the people in the Colorado school" because "it was premeditated," "it was a mass number of people that were killed randomly," and "[t]hey had no remorse." (The 1999 shooting at Columbine High School in Colorado had occurred two days prior to the instant voir dire.) Although D.K. said a mass murder was not a prerequisite for imposing the death penalty, she could not think of a scenario involving a single killing that warranted death.

Defense counsel opposed a challenge for cause, arguing that D.K. stated she could be fair and she could be convinced to impose the death penalty. The prosecutor asserted that D.K.'s questionnaire responses showed she could not be fair and her voir dire answers failed to explain some of her written responses. The trial court granted the challenge for cause, commenting that "she's not somebody that is reasonably likely to apply the correct test. She's somebody that is going to say you have to have no

37

redeeming value at all here, as opposed to weighing both sides. And I do give a lot of weight to what she wrote as well." When defense counsel questioned the view that her written responses reflected her true feelings, the trial court responded that "her comments were repeated and very strong here," and the court was not persuaded "she's open-minded in this case."

Substantial evidence supported the trial court's determination based upon our precedents. D.K.'s written jury questionnaire stated unambiguously that she opposed the death penalty, could not think of any crime warranting it, and would be unable to personally impose it based upon her religious views. Although she asserted during voir dire that she could, in fact, impose the penalty and be fair to both sides, she indicated she could impose the death penalty only in "extreme circumstances." The only example she could give of a circumstance warranting the death penalty was the mass killing at Columbine High School. Given this record, the trial court could reasonably conclude D.K.'s views substantially impaired her from serving on a capital jury. (See *People v. Jones* (1997) 15 Cal.4th 119, 165 [prospective juror properly excused for cause where the juror initially indicated he could not impose the death penalty due to his religious beliefs but later stated he could impose the penalty " 'in the case of Charles Manson' or 'Jimmie Jones' "], overruled on another ground in *Hill, supra,* 17 Cal.4th at p. 823, fn. 1.)

(vii) Prospective Juror I.L.

Prospective Juror I.L. was a 48-year-old office assistant who lived in Oxnard. She indicated in her jury questionnaire that she had "mixed feelings" about the death penalty and that "[i]t all depends on the type of crime committed and the circumstances." When asked if her views about the death penalty had changed over time, I.L. stated she "always believed this is very hard" and "I don't believe in it but it[']s necessary sometimes." I.L. indicated she had no strong views for or against the death penalty that would cause her to vote for or against that punishment regardless of the evidence, she was not a member of any group advocating for increased or decreased use of the death penalty, and she held no

38

religious beliefs that would make it difficult to sit in judgment of another.  With regard to whether she believed there should be a death penalty law on a scale of 1 to 10, I.L. marked "5."

When asked during voir dire if she held any views about the death penalty that she had not already expressed, I.L. said she had "seen a lot of . . . programs and a lot of cases" and "sometimes it is necessary . . . ."  However, she added:  "But I just don't feel me, myself, you know.  Because I am — other people [are] . . . doing the decision, not me.  I don't know, you know, in my own person how I will react . . . having to . . . take such an important decision like that."  Defense counsel asked I.L. to explain her questionnaire answer that she did not believe in the death penalty but believed it was sometimes necessary.  She replied that sometimes people may commit crimes warranting death but "I mean it has maybe to be something really horrendous or something for me to really firmly believe on that . . . ."  Although she stated she was "not sure" whether she could deliberate and form her own opinion about the proper penalty, I.L. later stated she "would think" she could do so and that she could keep an open mind.  However, when defense counsel asked if she could change her mind during deliberations if she was convinced she was wrong, I.L. replied she would not be able to because she was "very hard-headed" and it would be "very hard," although she ultimately stated she could "[p]erhaps" change her mind.  When asked by the prosecutor if she could ever see herself voting for death "in a case like this," I.L. responded "[n]o" and explained she "never . . . in my thoughts would [she] think that [she] would be . . . doing this type of [thing]."  When asked if she could ever vote for death, I.L. replied, "I don't know."  The prosecutor inquired if I.L. could vote for death if the evidence was "really bad" and if she believed the death penalty "was the right penalty," and she answered, "I could vote for it, but I know that that is going to make me very unhappy . . . in my future life . . . ."  When asked whether knowing such a decision would make her very unhappy would keep her from voting for death, I.L. responded, "I would probably think so."  The prosecutor pressed the

39

point, asking if she would always vote for life given her feelings, to which I.L. replied, "I would think that I would vote for life in prison." Defense counsel asked if she could vote for death even if it made her unhappy and I.L. responded, "I think so" and stated she would not automatically vote for life. I.L. also indicated she had previously made "[m]any" decisions that made her unhappy.

In arguing against a challenge for cause, defense counsel argued that I.L. was "right in the middle" and that the prosecutor's questioning was misleading because I.L. said she could impose the death penalty despite the fact that that it would make her unhappy. The prosecutor countered that I.L. had "waffled back and forth" and that her multiple statements that voting for death would make her unhappy indicated that her views would impair her ability to be fair. The trial court granted the challenge, explaining that her answer about voting for death making her unhappy was "significant," she "went back and fo[]rth," and she fell "partly in the category of . . . if I can't tell what their views are then we have got a problem."

Under our precedents, substantial evidence supported the trial court's implied finding that I.L.'s views impaired her ability to serve as a juror. I.L. made equivocal statements regarding her ability to impose the death penalty. Although she said the penalty was sometimes necessary, she also said she was "not sure" if she could personally make the penalty determination, even though she later stated she "would think" she could. Similarly, I.L. indicated she would not be able to change her mind during deliberations if she had been convinced she was wrong because she was "very hard-headed," although she later stated "[p]erhaps" she could change her mind. When asked if she could vote for death here, I.L. said, "I don't know" and then suggested that she could but that such a decision would make her "very unhappy" and that her views "would probably" incline her to vote for life. Although I.L. indicated she had made other decisions that had made her unhappy, the totality of I.L.'s responses reflected doubts regarding her ability to make the penalty determination. The trial court could reasonably

40

conclude on this record that her feelings regarding the effect of imposing the death penalty would substantially impair her performance as a juror in a capital case. (See *Tate, supra,* 49 Cal.4th at p. 676 [prospective juror properly excused for cause where he "expressed serious doubts that he had the ability ever to impose the death penalty"]; *People v. Chatman* (2006) 38 Cal.4th 344, 366 [prospective juror properly excused for cause where he stated it would be " 'incredibly' " hard to impose the death penalty and " 'it's very difficult how I feel about it would not enter into my decisions' "].)

(viii) Prospective Juror R.B.

Sixty-four-year-old Prospective Juror R.B. was a retired owner of a carpet cleaning business who lived in Ventura. In his jury questionnaire, R.B. indicated that he believed the death penalty served no purpose and felt it was imposed too often. However, he maintained that he had no strong views for or against the death penalty that would make him always vote for a particular penalty, and he indicated he could be openminded. When asked on a scale of 1 to 10 whether there should be a death penalty law, R.B. circled "2." R.B. revealed that his son had been convicted of a "sex crime" the prior year and was currently in jail.

The trial court inquired during voir dire whether R.B. could vote for death, to which he replied, "maybe [he] could," though he did not believe in the death penalty. R.B. further expounded, "I would try to be fair, but I don't believe it's right for us to have laws against killing people and then the state go about doing it." When asked by the trial court how he reconciled his view that the death penalty was wrong with his statement that he could impose it, R.B. responded, "Maybe mass murderers." Upon defense counsel's questioning, R.B. reiterated that he had no strong views about the death penalty that would make him always vote for life. When asked if it was correct that he could be openminded, R.B. replied, "[m]ore or less correct" and explained he would "have a very difficult time voting for the death penalty" and he could "do it if [he] had to . . . ." R.B. further explained: "I don't believe we should have the death penalty, but it is the law,

41

and if I am selected to do this terrible job, I would try to be as fair as I could in doing it." The prosecutor inquired about R.B.'s feelings regarding his son's prosecution, and he responded that he "certainly [has] mistrust" of the district attorney's office and he told the prosecutor, "I would say I don't trust you, yes." When asked if this feeling would affect his ability to be a juror, R.B. stated he "would take a hard look at [the prosecution's] evidence." When asked if he could personally impose the death penalty, R.B. responded he could, though he "would not feel comfortable" but "if that was the law and it was my responsibility to do it, I would do it." When asked to name some types of crimes warranting the death penalty, R.B. stated, "Mass murderers, murderers of children." Absent those circumstances, R.B. still indicated he could impose death, though he repeatedly said it would be "very difficult." Upon defense counsel's questioning, R.B. reiterated that he could personally impose the death penalty. The trial court asked for clarification regarding R.B.'s mistrust of the district attorney's office. R.B. explained he felt his son was innocent and wrongly convicted.

The trial court granted a challenge for cause. The court first explained that "the incident with his son is very fresh, and he had no trouble telling [the prosecutor] he mistrusts her on account of it. . . ." The trial court also found "that he appeared to me to be stretching a point to say that he could vote for it and, in particular, he also indicated he could do it if he had to. And as we've discussed at length this morning, the law never tells anybody that they have to."

Substantial evidence supported the trial court's determination under applicable case law. As with prospective jurors E.S.T., R.H., and D.K., R.B. indicated he would only be able to impose the death penalty under circumstances not involved in the instant case, such as "[m]ass murderers, murderers of children." (See *Bradford, supra,* 15 Cal.4th at pp. 1318-1321.) Additionally, as the trial court observed, R.B. appeared to harbor bias against the prosecution based upon the recent prosecution of his son by the same district attorney's office. " 'To find actual bias on the part of an individual juror,

42

the court must find "the existence of a state of mind" with reference to the case or the parties that would prevent the prospective juror "from acting with entire impartiality and without prejudice to the substantial rights of either party." ' [Citation.]" (*People v. Horning* (2004) 34 Cal.4th 871, 896.) Based upon R.B.'s comments that he "mistrust[ed]" the prosecution and that his son was wrongly prosecuted by the same agency, the trial court could reasonably find that R.B. exhibited such bias. (See *People v. Thomas* (1990) 218 Cal.App.3d 1477, 1484-1485 [removal for cause of juror for bias proper based upon bias against police officers]; cf. *People v. Nesler* (1997) 16 Cal.4th 561, 577-590 [juror should have been removed during the sanity phase for actual bias].) Based upon this record, the trial court could reasonably conclude R.B.'s views substantially impaired his ability to serve on a capital jury.

(ix) Prospective Juror L.G.

Prospective Juror L.G. was a 50-year-old diagnostic technician residing in Oxnard. In describing her general feelings about the death penalty, L.G. wrote in her jury questionnaire that she had "not given it much thought. It's a tough decision. It needs to be handed down, depending on evidence." She indicated that the death penalty "sends out a strong message," and when asked what types of crimes warranted the death penalty, she wrote "[m]urder." As to whether she believed there should be a death penalty law on a scale of 1 to 10, L.G. circled "7." L.G. also answered "yes" to the query whether she had religious or moral views which would make it difficult for her to sit as a juror in a capital case, explaining: "It should be difficult, a person's life is at stake, but I know it's a decision that needs to be made."

When asked during voir dire if she could be fair, L.G. responded, "I think I could be fair" but said it would be "very hard" for her. The trial court inquired whether L.G. would automatically vote for one penalty over the other, and L.G. replied that she had "done a lot of praying on it" and had not "really come to with an answer," that "it would be hard," and that she "would do [her] best." Upon questioning by defense counsel, L.G.

43

expressed her view that the death penalty should be imposed in some cases but it would be "[h]ard to vote for death." When asked if she could vote for death, L.G. replied, "I don't — I think I probably could. I just — I don't know." L.G. agreed with defense counsel that "this whole thing is making [her] very uncomfortable" and that she was "[n]ervous." When the prosecutor asked about her religious beliefs, L.G. stated she had been praying to "[g]ive [her] the strength to do whatever [she had] to do." When asked how she felt about imposing the death penalty, L.G. responded she felt "very uncomfortable." When asked again if she could "actually impose a death penalty on another person," L.G. initially stated, "I can't say really," but then stated, "No, I can't. I couldn't do it." The prosecutor pressed the point and inquired whether L.G. would "pretty much in all cases" vote for life, and L.G. agreed. Upon defense counsel's questioning, L.G. stated she could consider both life and death and could choose one "[d]epending on what the evidence is." The prosecutor inquired whether L.G. could impose the death penalty on "a real person," pointing to defendant, and she replied, "It's very hard, but I don't think so." The trial court excused L.G. without hearing argument, telling her he was excusing her because "obviously even thinking about voting for the death penalty upsets you . . . ."

The trial court's determination was supported by substantial evidence under our precedents. L.G. repeatedly indicated she did not know whether she could impose the death penalty, and voir dire concluded with L.G.'s statement that she "couldn't" impose the death penalty, her agreement that she would choose life in prison "pretty much in all cases," and her statement that she did not think she could impose the death penalty on "a real person." Based upon these responses, the trial court could reasonably conclude L.G.'s views substantially impaired her ability to serve on a capital jury. (See *Clark, supra,* 52 Cal.4th at p. 898 [prospective juror properly excused for cause where the juror stated she would have a "hard time" voting for death and gave conflicting responses whether she could set aside her feelings]; *Solomon, supra,* 49 Cal.4th at p. 836

44

[prospective juror "was excused because she was unable to say she could return a death verdict in an appropriate case"]; *Mills, supra,* 48 Cal.4th at p. 188 [prospective juror properly excused for cause where she indicated it would be "very hard" to impose the death penalty and she did not believe she could do so].)

(b) Juror Not Excused for Cause

At the time of jury selection, Juror No. 3 was a 32-year-old design manager residing in Thousand Oaks. When asked on his jury questionnaire about his general feelings regarding the death penalty, Juror No. 3 wrote, "For it." He also indicated "[p]ro" when asked about his general feelings regarding life imprisonment without parole. When asked if the death penalty serves a purpose, Juror No. 3 wrote, "Might save someone else[']s life, saves taxpayer $." He listed "1st Degree Murder" as a type of crime warranting the death penalty and indicated he believed the death penalty was not imposed often enough. Although Juror No. 3 noted he did not have feelings for or against the death penalty that were so strong he would always vote for death or life, he checked "no" regarding the question whether he was open-minded about the proper penalty before having heard any evidence, explaining, "Only if innocent." On a scale of 1 to 10, Juror No. 3 marked "10" regarding whether he believed there should be a death penalty law. Juror No. 3 stated that he could freely deliberate with other jurors and that he could change his vote if convinced he was wrong.

During voir dire, the trial court inquired about Juror No. 3's questionnaire answer that he could be openminded about penalty "[o]nly if innocent." Juror No. 3 responded that he "didn't realize that the defendant was already convicted" and that he "didn't know exactly what this case was about." Juror No. 3 said that now that he understood that defendant had already been convicted, he would change his answer and agreed with the trial court that he "could vote for either penalty in this case." Defense counsel asked Juror No. 3 about his answer that the death penalty should be imposed for first degree murder. Juror No. 3 said, "I see your point" but said he stood by his answer "unless my

45

mind could really be changed." When asked to clarify, Juror No. 3 stated "if somebody could debate the issue and convince me otherwise, I'm always . . . open to expanding ideas. . . ." Defense counsel inquired, "By debating the issue, you mean debating whether or not the death penalty is a good law or not?" to which Juror No. 3 responded, "Sure." When asked if he could vote for life without parole for first degree murder, Juror No. 3 stated he could, stating, "In the event that . . . I am shown better reasoning based on my perception, I might . . . change my views on it." Defense counsel asked, "unless someone changes your views during the course of the trial or anywhere else, you would vote for death on a first degree murder; is that correct?" Juror No. 3 replied, "I think I would." The prosecutor asked Juror No. 3 whether his response that first degree murder warranted the death penalty meant that he believed all first degree murderers should get the death penalty or whether he was merely stating a category of offense eligible for death. Juror No. 3 clarified that he "would not reserve the death penalty for only first degree murder," though he conceded he did not know "all the details and differences between first, second, third and all those" and he was "not studied enough." When asked if all murderers should receive the death penalty, Juror No. 3 replied, "No." The prosecutor asked for elaboration on when a crime deserved death, and Juror No. 3 stated that if "somebody knowingly [] goes into a situation and causes a murder . . . and with reasonable intelligence can say that it's very likely that this will happen or it's a good chance, I think . . . the death penalty should be considered." Juror No. 3 agreed that death should not be "automatic" and that "[t]here might" be situations where an intentional murder did not warrant death, though he did not "know what that would be . . . ." Juror No. 3 agreed with the prosecutor that he would need more information before voting for death in the present case, including the circumstances of the crime, and he responded he thought defendant's background might be important in that determination. Juror No. 3 indicated he would be able to evaluate the aggravating and mitigating evidence, and make

46

a decision regarding the proper penalty. When asked if he had already made up his mind, Juror No. 3 replied, "No, of course not."

Defense counsel asked Juror No. 3 if he was predisposed to impose the death penalty "unless the defense can prove otherwise." Juror No. 3 agreed, stating that although he was "very careful about other people's lives," he had "been in a situation where somebody had the choice to go in the opposite direction and . . . decided to try to stick a knife in me" and he was "concerned about safety." Juror No. 3 agreed with defense counsel that "right now without knowing anything else, [his] position is that [defendant] should be executed. . . ." Upon the prosecutor's questioning, Juror No. 3 indicated he was leaning in favor of death but that he would consider both punishments and it would be difficult to impose the death penalty on defendant.

At this point, the trial court inquired why Juror No. 3 felt this was "a death penalty case unless proven otherwise." Juror No. 3 responded that, based upon his "fairly weak" understanding of first degree murder, death was the appropriate punishment for that offense. When asked what he thought constituted first degree murder, Juror No. 3 responded, "a preconceived plan to murder . . . ." The trial court denied the defense challenge for cause. The prosecutor thereafter questioned Juror No. 3 about other aspects of his jury questionnaire unrelated to the death penalty. The trial court later explained its ruling, stating that it was the court's impression "that he's somewhat naïve about the law and was basing a lot of his answers on assumptions about the law, and that's why I tried to ask him a couple of open-ended things. [¶] My gut feeling from him is that he's a fair person who's open to being . . . persuaded either way and would become more so probably as the trial goes along rather than less so, just because of being subjected to the process. [¶] So I just have a strong feeling you have an open-minded juror here based on all the circumstances."

As an initial matter, defendant acknowledges that he failed to exhaust his peremptory challenges. " ' "To preserve a claim of error in the denial of a challenge for

47

cause, the defense must exhaust its peremptory challenges. . . .” ’ [Citation.]” (*People v. Farley* (2009) 46 Cal.4th 1053, 1096; see *People v. Davis* (2009) 46 Cal.4th 539, 582.) “Defendant could have used a peremptory challenge to remove this juror but chose not to do so. Accordingly, defendant may not now complain that he was an actual juror.” (*People v. Hillhouse* (2002) 27 Cal.4th 469, 487.)

In any event, applicable precedents compel us to conclude that substantial evidence supports the trial court’s determination. *People v. Crittenden* (1994) 9 Cal.4th 83 (*Crittenden*) involved a challenge against two prospective jurors. Prospective Juror Carrington stated in his jury questionnaire that if the defendant committed first degree murder, the death penalty should be imposed regardless of defendant’s background, while Prospective Juror Roberts indicated he believed the death penalty deterred crime and initially gave conflicting statements regarding whether he would automatically impose the death penalty. (*Id.* at p. 122.) We upheld the trial court’s denial of challenges for cause, noting that both prospective jurors stated they could consider the evidence, they could consider life imprisonment based upon the circumstances, and they would not automatically vote for the death penalty. (*Id.* at pp. 122-123.) Similarly, in *People v. Farnam* (2002) 28 Cal.4th 107 (*Farnam*), as relevant here, a prospective juror “indicated his general philosophy was that all first degree murderers should get the death penalty and nothing else.” (*Id.* at p. 133.) However, because the prospective juror said that “he could set aside that philosophy and be open to both possible penalties” and that he would “be guided by the evidence and would vote for life without the possibility of parole if the evidence persuaded him it was proper,” we upheld the trial court’s denial of a challenge for cause. (*Id.* at pp. 133-134.)

In the present case, although Juror No. 3 expressed a preference for the death penalty, like the prospective jurors in *Crittenden* and *Farnam*, he stated on multiple occasions that he would not automatically impose death, he had not yet made up his mind, he could consider the relevant aggravating and mitigating circumstances, and he

48

would consider both penalties.  Although Juror No. 3 made some statements regarding imposing the death penalty for intentional murderers, the trial court correctly observed that his comments appeared to be based largely upon an ignorance of the law, which Juror No. 3 readily admitted.  On this record, Juror No. 3 did not hold "an unalterable preference in favor of the death penalty."  (*Farnam, supra,* 28 Cal.4th at p. 134; see *Crittenden, supra,* 9 Cal.4th at pp. 122-123; see also *People v. Jackson* (1996) 13 Cal.4th 1164, 1199 ["Each [prospective juror] modified his or her initial strong stance in favor of the death penalty in the abstract with the willingness to consider the particular circumstances of the case, and to follow the applicable law, at the penalty phase."] (*Jackson*).)

4.  Juror Misconduct

Defendant contends that some members of the jury were exposed to extraneous information during jury selection in the form of defendant's statements directed at the prosecutor that defendant would "tear his head off" and that he had "nothing to lose." (See *ante*, at pp. 18-19.)  Defendant also argues that the jury's exposure to a news article regarding these statements constituted misconduct.

Initially, it is true that "we have found juror misconduct where a juror actively or passively obtains information about a case from *outside* sources" and that such misconduct raises a presumption of prejudice " 'because it poses the risk that one or more jurors may be influenced by material that the defendant has had no opportunity to confront, cross-examine, or rebut.  [Citation.]" (*People v. Gamache* (2010) 48 Cal.4th 347, 398 (*Gamache*).)  But even assuming that defendant's outbursts occurring *in the courtroom* during jury selection constituted the receipt of information from an "outside" source, we have stated, "a defendant may not be heard to complain when, as here, such prejudice as he may have suffered resulted from his own voluntary act."  (*People v. Hendricks* (1988) 44 Cal.3d 635, 643 [courtroom outburst by the defendant]; see *People*

49

*v. Huggins* (2006) 38 Cal.4th 175, 201 [" 'As a matter of policy, a defendant is not permitted to profit from his own misconduct.' [Citation.]"].)

In any case, as the Attorney General observes, the record does not support defendant's claim that at least two jurors must have heard defendant's statements. As recounted above, the events here occurred during individualized *Hovey* voir dire of the second penalty jury. After eventual Juror No. 7 was examined, defense counsel brought to the court's attention that defendant was "getting a little irritated" by the prosecutor's repeated reference to him as "that man." The trial court eventually asked the prosecutors to use different phrasing, and the next prospective juror, eventual Juror No. 4, entered the courtroom. During examination of Juror No. 4, the prosecutor once referred to defendant as "this man over here (indicating) in the striped shirt." Next, Prospective Juror D.I. entered the courtroom and was excused for cause after brief questioning by the trial court only. It was during or after D.I. had departed the courtroom that defendant made his statement, "I'll tear his head off." The trial court then questioned Prospective Juror R.R. and excused her for cause without questioning by the parties. After a recess, the trial court and the attorneys met in chambers to discuss the bailiffs' request that defendant be shackled due to defendant's "anger over the recent events in the courtroom as to how he's being referred to [by] the prosecutors." The trial court made a record that "[a]s one juror was . . . leaving and we were waiting for the next one to come in, Mr. McKinzie, in a voice audible to me at the bench, at counsel table there was used some kind of a phrase about socking Mr. Glynn, and 'I have got nothing to lose.' And then there were some very aggressive comments apparently made in the lockup area and during the break."

Based on this record, defendant's statement "I'll tear his head off" could have been heard, at most, by Prospective Jurors D.I. and R.R., neither of whom served on the jury. Defendant asserts that his statements that he had "nothing to lose" and that he wanted to "sock[]" the prosecutor must have been made in front of either Juror No. 7 because it was during that examination that defendant had become "a little irritated," or

in front of Juror No. 4 because the prosecutor referred to defendant as "this man" for the last time before the court recess while examining Juror No. 4. The record belies this assertion. Although the reporter's transcript does not reflect when defendant made his statements regarding having nothing to lose and wanting to "sock[]" the prosecutor, the incident reports of two deputies on duty appear to confirm that defendant made these statements contemporaneously with his "I'll tear his head off" comment. Ventura County Sheriff's Deputy Robert Ortiz was working as a security officer in the courtroom. He wrote in his report that "[w]hile an unidentified juror exited the courtroom, I heard McKinzie mutter, 'I ain't got nothing to lose. I ain't got nothing to lose' " and that defendant glared at the prosecutors and appeared agitated. Ortiz then informed the assigned bailiff of the courtroom, Ventura County Sheriff's Deputy Mary Smith, about the statement and "[a]fter an interview of a potential juror, Smith requested a court recess to evaluate the situation and inform [the trial court] of McKinzie's statement." Smith stated in her report that while she was out of the courtroom escorting in and out prospective jurors, Ortiz approached her and indicated defendant had been overheard saying, "I have nothing to lose." Smith saw defendant was agitated and arguing with his attorneys. Ortiz stated he believed everyone in the courtroom heard the comment. Smith then approached the court clerk who confirmed that "everyone heard the statement." Smith asked the clerk to inform the trial court she would like a recess to assess the situation, and the trial court "called a recess after we finished a *Hovey* exam." Smith recounted that once defendant was shackled and escorted to the "sallyport located between courtrooms," defendant made additional statements expressing his displeasure at being referred to as "that man" and how he wanted to "rip his fucking head off right now!" After defendant made these statements, Smith informed the trial court, and the trial court held an in-chambers session to address the issue.

Based upon this record, the only reasonable conclusion is that defendant made the statements at issue between the examinations of Prospective Jurors D.I. and R.R. and not

51

in front of Juror No. 4 or No. 7.  The reports of both Deputies Ortiz and Smith confirm that defendant made his comments between the examination of two prospective jurors, and the trial court then examined one more prospective juror before calling a recess and convening an in-chambers session.  Defendant points to nothing else in the record supporting a different conclusion.  Given no sitting juror could have possibly heard defendant's comments, defendant cannot show any juror misconduct on this record.  (See *People v. Arias* (1996) 13 Cal.4th 92, 143-148 [rejecting claim that the defendant suffered prejudice from his own outbursts before the jury]; cf. *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1177-1180 [no prejudice from a juror's observation of the defendant being transported in handcuffs].)

To the extent that defendant claims jury misconduct based upon the jury's exposure to a newspaper article about defendant's courtroom outburst, none of the sitting jurors had read the article, and only one alternate juror had read the article in question "partway."  (See *ante*, at p. 21.)  For the reasons already discussed, defendant could not have suffered prejudice based upon any jury exposure to the newspaper article.  (*People v. Cook* (2007) 40 Cal.4th 1334, 1360-1361 (*Cook*); *Stanley, supra,* 39 Cal.4th at pp. 946-951.)

5. Inadequate Appellate Record

Defendant contends that he has been denied due process and that meaningful appellate review is not possible because the appellate record here is deficient in two respects.  " ' " [S]tate law entitles a defendant only to an appellate record 'adequate to permit [him or her] to argue' the points raised in the appeal.  [Citation.]  Federal constitutional requirements are similar.  The due process and equal protection clauses of the Fourteenth Amendment require the state to furnish an indigent defendant with a record sufficient to permit adequate and effective appellate review.  [Citations.]  Similarly, the Eighth Amendment requires reversal only where the record is so deficient as to create a substantial risk the death penalty is being imposed in an arbitrary and

52

capricious manner. [Citation.] The defendant has the burden of showing the record is inadequate to permit meaningful appellate review. [Citation.]" [Citation.]' [Citation.]" (*People v. Letner* (2010) 50 Cal.4th 99, 195 (*Letner*); see *People v. Harris* (2008) 43 Cal.4th 1269, 1280; *People v. Rogers* (2006) 39 Cal.4th 826, 857-858.)

Defendant first notes that the jury questionnaires of 55 prospective jurors from the first trial, including K.S., have been lost. However, defendant makes no attempt to explain how the absence of these questionnaires precluded meaningful appellate review of his *Wheeler/Batson* claim with respect to K.S. "[M]aterial from the now lost items survives in the reporter's and clerk's transcripts through quotation and paraphrase." (*People v. Alvarez* (1996) 14 Cal.4th 155, 196, fn. 8 [rejecting same claim].) As recounted above (see *ante*, at pp. 13-14), the *Hovey* voir dire examination of K.S. involved questioning regarding relevant portions of K.S.'s jury questionnaire. Further, in explaining his reasons for peremptorily challenging K.S., the prosecutor made reference to K.S.'s questionnaire answers, and defense counsel made no objection to these characterizations. With respect to the other lost jury questionnaires, even assuming they were relevant to a comparative juror analysis, the reporter's transcript of the individualized *Hovey* voir dire as to each prospective juror provides an ample appellate record on this point. (See *People v. Ayala* (2000) 24 Cal.4th 243, 269-270 [rejecting claim that loss of jury questionnaires deprived the defendant of meaningful appellate review of *Wheeler* claim]; see also *People v. Haley* (2004) 34 Cal.4th 283, 305-306 [rejecting similar claim in the context of *Witt* error].)

Second, defendant asserts that the record is inadequate to determine which prospective jurors during selection of the second penalty jury might have been exposed to defendant's courtroom outbursts. Defendant's assertion is based upon Deputy Ortiz's incident report regarding the matter, which defendant claims references an unreported interview between the deputies and an unnamed prospective juror. Defendant's claim is based upon a misreading of the record. As recounted above (see *ante*, at p. 51), Ortiz

wrote in his report that he informed the assigned bailiff, Deputy Smith, of defendant's statements, and "[a]fter an interview of a potential juror, Smith requested a court recess to evaluate the situation. . . ." The referenced "interview" was not an interview of a prospective juror by a deputy, but rather the *Hovey* examination itself. Ortiz's report earlier referred to *Hovey* voir dire as "pre-jury interviews (*Hovey* exams)." This understanding is consistent with Smith's incident report, in which she stated she had requested a recess, and the trial court "called a recess after we finished a *Hovey* exam." Defendant has not demonstrated on this record that anything is missing.[1]

B. Guilt Phase

1. Admission of Photographs

Defendant argues that the trial court's admission into evidence of various autopsy and crime scene photos violated his state and federal rights to due process and a fair trial. Over defense objection, the trial court allowed into evidence People's exhibit Nos. 125 and 126, photographs that depicted the victim's body lying in a drainage ditch; People's exhibit Nos. 142 and 143, autopsy photos that depicted the left side of the victim's face and showed petechial hemorrhages; People's exhibit Nos. 144 and 145, autopsy photos that depicted the area around the victim's mouth and also showed petechial hemorrhages; People's exhibit Nos. 146 and 151, autopsy photos showing the victim's neck; and People's exhibit No. 164, an autopsy photo depicting the top of the victim's head with a portion of the skull removed. The trial court excluded People's exhibit No. 150, an

---

[1]     Defendant requests judicial notice of the files and record in *McKinzie v. Superior Court*, S147509 (petn. den. July 11, 2007), wherein defendant sought mandate after the trial court denied his requests to recreate the record with respect to the lost jury questionnaires and the allegedly lost interview, claiming judicial notice is required to "complete the record." Given the prior proceeding is related to defendant's claim here, we grant his request for judicial notice. (See *People v. Marlow* (2004) 34 Cal.4th 131, 149 [granting judicial notice of separate capital case involving the defendant]; Evid. Code, §§ 452, subd. (d), 459, subd. (a).)

54

autopsy photo of the victim's neck, and People's exhibit No. 163, an autopsy photo of the top of the victim's head, as duplicative.

According to defendant, these photos should have been excluded because they were unnecessarily gruesome and served only to inflame the jury. " 'The admission of photographs of a victim lies within the broad discretion of the trial court when a claim is made that they are unduly gruesome or inflammatory. [Citations.] The court's exercise of that discretion will not be disturbed on appeal unless the probative value of the photographs clearly is outweighed by their prejudicial effect. [Citations.]' [Citation.]" (*People v. Virgil* (2011) 51 Cal.4th 1210, 1247-1248 (*Virgil*).)

No abuse of discretion appears here. "[P]hotographs of murder victims are relevant to help prove how the charged crime occurred, and . . . in presenting the case a prosecutor is not limited to details provided by the testimony of live witnesses." (*People v. Booker* (2011) 51 Cal.4th 141, 170 (*Booker*).) Photos of both the crime scene and autopsy were highly probative of how the victim was killed. The photos of the victim in the ditch showed the victim's wounds as she was found and also suggested the victim had been pushed or thrown into the ditch, which bolstered the prosecution's theory of the case that defendant acted with malice by beating the victim and driving her to this location to dispose of her body. (See *People v. Lewis* (2009) 46 Cal.4th 1255, 1283 [victim photos "reflect the viciousness and strength of the assault, which is relevant to prove that defendant acted with malice and sought to ensure the victim was dead"].) The autopsy photos supported Dr. Frank's testimony regarding the causes of the victim's death. The photos of the victim's face, which depicted petechial hemorrhages, and of her neck suggested she was not only beaten but also strangled. Finally, the photograph depicting the victim's skull showed the severity of the blunt force trauma and the subdural hematoma caused by the blows suffered by the victim. "Autopsy photographs are routinely admitted to establish the nature and placement of the victim's wounds and to clarify the testimony of prosecution witnesses regarding the crime scene and the autopsy,

even if other evidence may serve the same purposes." (*People v. Howard* (2010) 51 Cal.4th 15, 33 (*Howard*); see *People v. Lewis, supra,* 46 Cal.4th at p. 1283 [victim photos "demonstrate that the victim was strangled"].)  "Although autopsy photographs of a murder victim are always unpleasant, the photographs in this case are not overly graphic and are relevant to the manner in which [the victim] was killed." (*Carey, supra,* 41 Cal.4th at p. 128.)

    2.  Instructional Issues

      (a) Accomplice Instructions

Defendant contends that the trial court erroneously instructed the jury regarding consideration of accomplice testimony.  "A conviction can not be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense . . . .  [¶] An accomplice is . . . one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given." (§ 1111.)  " 'If there is evidence from which the jury could find that a witness is an accomplice to the crime charged, the court must instruct the jury on accomplice testimony.  [Citation.]  But if the evidence is insufficient as a matter of law to support a finding that a witness is an accomplice, the trial court may make that determination and, in that situation, need not instruct the jury on accomplice testimony.' [Citation.]" (*People v. Gonzales* (2011) 52 Cal.4th 254, 302 (*Gonzales*); see *People v. Hinton* (2006) 37 Cal.4th 839, 879.)

The trial court here defined an accomplice (CALJIC No. 3.10 [Accomplice—Defined]), instructed the jury regarding the corroboration requirement (CALJIC Nos. 3.11 [Testimony of Accomplice Must Be Corroborated]; 3.12 [Sufficiency of Evidence to Corroborate an Accomplice]), and identified Theresa Johnson as an accomplice as a matter of law (CALJIC No. 3.16 [Witness Accomplice as Matter of Law]), but only as to counts 6 and 8, the second degree burglary counts involving the use of the victim's ATM card at two stores.  Defendant first argues that the trial court should not have limited

56

these instructions to counts 6 and 8, and should have identified Johnson as an accomplice as a matter of law as to all counts. The claim fails. "[A]n accomplice is one who aids or promotes the perpetrator's crime with knowledge of the perpetrator's unlawful purpose *and* an intent to assist in the commission of the target crime . . . ." (*People v. Williams* (2008) 43 Cal.4th 584, 637.) "In order to be an accomplice, the witness must be chargeable with the crime as a principal (§ 31) and not merely as an accessory after the fact (§§ 32, 33)." (*People v. Sully* (1991) 53 Cal.3d 1195, 1227.) There was no evidence here that Johnson was aware of defendant's attack on Avril until well after the fact, much less that she assisted in the attack with knowledge of defendant's purpose and with a purpose to aid him. Instead, the evidence showed Johnson's awareness that the ATM and credit cards in defendant's possession were stolen when she used the ATM card at defendant's urging at the two stores. Accordingly, the trial court properly instructed the jury that Johnson was an accomplice as a matter of law but only as to those two burglary counts involving use of the stolen cards.

Defendant next claims that the trial court should have instructed the jury to determine whether Donald Thomas was an accomplice. Defendant argues substantial evidence warranted such an instruction, noting the testimony of James Young, who allegedly heard Thomas say he had burglarized an apartment "across from the garage" where they would "hang out" and that he had obtained a television and VCR when someone woke up and things got "bad." Even assuming error, defendant could not have been prejudiced. " 'A trial court's failure to instruct on accomplice liability under section 1111 is harmless if there is sufficient corroborating evidence in the record.' [Citation.] 'Corroborating evidence may be slight, may be entirely circumstantial, and need not be sufficient to establish every element of the charged offense.' [Citation.] The evidence is 'sufficient if it tends to connect the defendant with the crime in such a way as to satisfy the jury that the accomplice is telling the truth.' [Citation.]" (*Gonzales, supra,* 52 Cal.4th at p. 303.) Here, there was ample corroborating evidence. According to

57

Gladney's testimony, defendant said that he attacked a "nice" woman who lived on Dollie Street, that he "kept hitting her and hitting her" because she would not stop yelling, that he also choked her, and that he eventually put her in the trunk of her car and "drove her off somewhere in Malibu." Defendant explained to Gladney that he attacked the woman for money to buy Christmas presents for his children. Defendant later gave several items taken from Avril's apartment to his daughter, including a camera and a pink bathrobe. Finally, C.J. Brewer testified, consistently with Johnson's account, that he bought stereo equipment from defendant for $150, which was later recovered and traced to Avril. This evidence sufficiently tied defendant to the instant crimes and rendered any instructional error harmless. (See *id*. at pp. 303-304 [any error in failing to give accomplice instructions harmless]; *Williams, supra,* 49 Cal.4th at p. 456 [same]; *People v. Hartsch* (2010) 49 Cal.4th 472, 499 [same] (*Hartsch*).)

(b) Unanimity Instruction

Defendant contends that the trial court should have instructed the jury that it must unanimously agree whether defendant committed first degree murder by committing a "willful, deliberate, and premeditated killing" or a killing in the commission of burglary or robbery. (See § 189.) He argues that because the two types of first degree murder have different elements, they constituted different offenses and required jury unanimity as to which of the two types he committed. We have repeatedly rejected the claim. " 'Felony murder and premeditated murder are not distinct crimes . . . .' [Citation.]" (*People v. Benavides* (2005) 35 Cal.4th 69, 101.) " '[T]he two forms of murder have different elements even though there is but a single statutory offense of murder.' [Citations.] When, as here, the evidence shows only a single discrete crime but leaves room for disagreement as to exactly how that crime was committed, the jury need not unanimously agree on the theory under which the defendant is guilty." (*Ibid.*) "[I]t has long been settled 'that unanimity as to the theory under which a killing is deemed culpable is not compelled as a matter of state or federal law. Each juror need only have

58

found defendant guilty beyond a reasonable doubt of the single offense of first degree murder as defined by statute and charged in the information. [Citations.]' [Citation.]" (*People v. Moore* (2011) 51 Cal.4th 386, 413; see *Tate, supra,* 49 Cal.4th at p. 697 [rejecting same claim]; *People v. Collins* (2010) 49 Cal.4th 175, 214 [same]; *People v. Friend* (2009) 47 Cal.4th 1, 54 [same].) Defendant presents no new argument calling these authorities into question.

(c) Reasonable Doubt Instruction

Defendant argues that various instructions given by the trial court diluted the reasonable doubt standard. The trial court gave several instructions addressing the reasonable doubt standard, including CALJIC No. 2.90, which informed the jury that "[a] defendant in a criminal action is presumed to be innocent until the contrary is proved," indicated that the prosecution bore the burden of proving guilt beyond a reasonable doubt, and defined "reasonable doubt." The trial court also gave the jury CALJIC No. 8.80.1, which stated in relevant part that the prosecution had the burden of proving the special circumstance allegations and that any reasonable doubt as to them required a not true finding, and CALJIC No. 17.24, which similarly stated that the prosecution bore the burden of proof beyond a reasonable doubt as to the enhancements for crimes against a victim 65 years of age or older.

Defendant points to language in the trial court's instructions regarding consideration of circumstantial evidence. CALJIC No. 2.01 stated in part: "[I]f the circumstantial evidence as to any particular charge, special circumstance, or allegation permits two reasonable interpretations, one of which points to the defendant's guilt and the other to his innocence, you must adopt that interpretation that points to the defendant's innocence, and reject that interpretation that points to his guilt. [¶] *If, on the other hand, one interpretation of this evidence appears to you to be reasonable and the other interpretation to be unreasonable, you must accept the reasonable interpretation and reject the unreasonable*." (Italics added.) The trial court gave a similar instruction

59

regarding evidence of specific intent or mental state. (See CALJIC Nos. 2.02, 8.83.1.) Defendant argues that the italicized language reduced the burden of proof from beyond a reasonable doubt to mere reasonableness.

We have previously rejected similar claims. "The plain meaning of these instructions merely informs the jury to reject unreasonable interpretations of the evidence and to give the defendant the benefit of any reasonable doubt. No reasonable juror would have interpreted these instructions to permit a criminal conviction where the evidence shows defendant was 'apparently' guilty, yet not guilty beyond a reasonable doubt." (*People v. Jennings* (1991) 53 Cal.3d 334, 386; see *People v. Vines* (2011) 51 Cal.4th 830, 885.) Further, these instructions "explicitly told the jury that every fact necessary to circumstantial proof of an offense or a special circumstance must be shown beyond a reasonable doubt," and "[t]he instructions told the jurors they must accept a reasonable inference pointing to guilt *only* where any other inference that could be drawn from the evidence was *unreasonable.* That direction is entirely consistent with the rule of proof beyond a reasonable doubt, because an *unreasonable* inference pointing to innocence is, by definition, not grounds for a *reasonable* doubt. The circumstantial evidence instructions are thus correct." (*People v. Brasure* (2008) 42 Cal.4th 1037, 1058 (*Brasure*).)

Defendant further argues that the circumstantial evidence instructions created an improper mandatory presumption that required the jury to draw an incriminating inference if it was merely reasonable. This claim has also been repeatedly rejected. "The challenged CALJIC instructions do not create a presumption, permissive or mandatory, as they do not permit or require any particular ultimate fact to be inferred from any particular predicate fact; they simply direct the jury, in general, to choose a reasonable conclusion over an unreasonable one in evaluating circumstantial evidence." (*People v. Snow* (2003) 30 Cal.4th 43, 95 (*Snow*); see *People v. Dement* (2011) 53 Cal.4th 1, 54

60

[rejecting same claim] (*Dement*); *People v. Verdugo* (2010) 50 Cal.4th 263, 295-296 [same]; *People v. D'Arcy* (2010) 48 Cal.4th 257, 295-296 [same].)

Defendant next contends that several instructions given by the trial court diluted the reasonable doubt instruction by suggesting that the jurors should decide between guilt or "innocence," criticizing in particular CALJIC Nos. 1.00 (Respective Duties of Judge and Jury) and 2.51 (Motive). As relevant here, CALJIC No. 1.00 cautioned the jury not to be influenced "by pity for or prejudice against a defendant," nor should the jury be biased against defendant "because he has been arrested for this offense, charged with a crime, or brought to trial." CALJIC No. 1.00 admonished: "None of these circumstances is evidence of guilt and you must not infer or assume from any or all of them that he is more likely to be guilty than not guilty." CALJIC No. 2.51 stated in relevant part that the presence of motive "may tend to establish the defendant is guilty" while "[a]bsence of motive may tend to show the defendant is not guilty." Initially, it should be noted that neither of these instructions makes any reference to "innocence." In any event, the use of "not guilty" in this context simply meant "evidence less than that required to establish guilt" and was not meant to convey that "defendant must establish innocence or that the prosecution has any burden other than proof beyond a reasonable doubt. [Citation.] Here, the jury was repeatedly instructed on the proper burden of proof." (*People v. Crew* (2003) 31 Cal.4th 822, 848; see *Dement, supra,* 53 Cal.4th at p. 54 [rejecting same claim]; *People v. Guerra* (2006) 37 Cal.4th 1067, 1039 [same] (*Guerra*).)

Defendant similarly argues that CALJIC No. 2.22 (Weighing Conflicting Testimony) reduced the burden of proof to preponderance of the evidence by telling jurors to compare the testimony of witnesses to determine which has "more convincing force." " ' "[I]t is apparent that the jury was instructed to weigh the relative convincing force of the evidence (CALJIC No. 2.22) only as part of the process of determining whether the prosecution had met its fundamental burden of proving [defendant's] guilt beyond a reasonable doubt . . . ." ' [Citations.]" (*People v. Maury* (2003) 30 Cal.4th 342,

61

429 (*Maury*); see *People v. Taylor* (2010) 48 Cal.4th 574, 631 [rejecting same claim] (*Taylor*); *Carey, supra,* 41 Cal.4th at p. 131 [same].)

Finally, defendant claims that CALJIC No. 2.27 (Sufficiency of Testimony of One Witness), by not being limited to prosecution witnesses, improperly suggested the defense had a burden to prove facts, thereby diluting the reasonable doubt standard. "Jurors are not reasonably likely to draw, from bits of language in instructions that focus on how particular types of evidence are to be assessed and weighed, a conclusion overriding the direction, often repeated in voir dire, instruction and argument, that they may convict only if they find the People have proven guilt beyond a reasonable doubt." (*Brasure, supra,* 42 Cal.4th at p. 1059.) This is especially true where the jury has been expressly instructed that "each fact which is essential to complete a set of circumstances necessary to establish the defendant's guilt must be proved beyond a reasonable doubt" and that "before an inference essential to establish guilt may be found to have been proved beyond a reasonable doubt, each fact or circumstance on which such inference necessarily rests must be proved beyond a reasonable doubt." (CALJIC No. 2.01; see *Dement, supra,* 53 Cal.4th at p. 55 [rejecting claim that CALJIC No. 2.27 suggested the defendant had the burden of proof].)

(d) Instruction on Motive

Defendant contends that the standard instruction on motive, CALJIC No. 2.51, reduced the prosecution's burden of proof because it suggested defendant could be convicted upon evidence of motive alone. Defendant points to language in the instruction stating that "[p]resence of motive may tend to establish the defendant is guilty." Defendant also asserts that the instruction required defendant to show a lack of motive or to rebut the prosecution's motive evidence. We have previously rejected these claims. The instruction "merely told the jury it may consider the presence or absence of motive. [Citations.] The motive instruction did not itself include instructions on the prosecution's burden of proof and the reasonable doubt standard, but it also did not undercut other

instructions that correctly informed the jury that the prosecution had the burden of proving guilt beyond a reasonable doubt." (*People v. Cleveland* (2004) 32 Cal.4th 704, 750.) Indeed, the instruction emphasized that motive "is not an element of the crime charged and need not be shown," presumably by either party, and did not suggest that the elements of the charged offenses need not be shown if defendant had a motive to commit the charged offenses. (See *People v. Mendoza* (2011) 52 Cal.4th 1056, 1094-1095 [rejecting same claims] (*Mendoza*); *Letner, supra,* 50 Cal.4th at p. 191 [same]; *People v. Wilson* (2008) 43 Cal.4th 1, 21-22 [same].)

### 3. Cumulative Error

Defendant argues that cumulative error during the guilt phase deprived him of a fair trial. As discussed, even assuming error in the trial court's failure to give accomplice instructions with respect to Donald Thomas, defendant could not have been prejudiced. Because that is the only potential error identified, defendant cannot show cumulative error. (See *Booker, supra,* 51 Cal.4th at p. 187 [rejecting claim of guilt phase cumulative error]; *People v. Avila* (2009) 46 Cal.4th 680, 718 [same].)

## C. Penalty Phase

### 1. Prosecutorial Misconduct

Defendant claims that the prosecutor committed misconduct in his penalty phase jury argument. " '[A]t the penalty phase a prosecutor commits misconduct under the federal standard by engaging in conduct that renders the trial so unfair as to constitute a denial of due process.' [Citations.] Under state law, it constitutes reversible misconduct for the prosecutor to employ deceptive or reprehensible methods to persuade the court or the jury [citation], when 'there is a reasonable possibility that without such misconduct, an outcome more favorable to the defendant would have resulted.' [Citations.] When the defense fails to object to asserted misconduct at trial and request that the jury be admonished, the claim ordinarily is forfeited on appeal. [Citations.]" (*Williams, supra,* 49 Cal.4th at p. 464.)

63

As an initial matter, defendant failed to object to any cited instance of misconduct. Because "[a] defense objection and an admonition by the court would not have been futile" (*Williams, supra,* 49 Cal.4th at p. 464), defendant has forfeited his claims. In any event, defendant's claims lack merit.

Defendant first claims that the prosecutor improperly argued that defendant's lack of remorse was an aggravating circumstance. " 'A prosecutor may properly comment on a defendant's lack of remorse, as relevant to the question of whether remorse is present as a mitigating circumstance, so long as the prosecutor does not suggest that lack of remorse is an aggravating factor.' [Citation.]" (*Blacksher, supra,* 52 Cal.4th at p. 843.) The prosecutor did not so suggest here because he expressly confined his argument regarding defendant's remorse (or lack of remorse) as "one final factor that falls in [f]actor (k)," i.e., "[a]ny other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime." (§ 190.3, factor (k).) In other words, the prosecutor made clear he was emphasizing the lack of evidence supporting remorse to show the absence of a mitigating factor, not suggesting lack of remorse constituted an aggravating factor. (See *Blacksher,* at p. 844 ["nothing in the prosecutor's argument asked the jury to consider lack of remorse as an aggravating factor"]; *People v. Bonilla* (2007) 41 Cal.4th 313, 357 ["The gist of the prosecutor's argument throughout . . . was that because Bonilla had shown no remorse, the jury should take his mitigating evidence, which amounted to a plea for mercy from his family, with a grain of salt, and should be less inclined to grant him mercy."].)

Defendant claims that the prosecutor improperly suggested to the jury that a lack of mitigating circumstances could be considered in aggravation. After arguing that several mitigating factors did not apply, the prosecutor stated: "I have gone through six factors that do not apply and crossed them out. And you may wonder, 'Well, why do I waste my time doing that?' The reason is that these are factors that the law contemplates you'll consider in deciding whether to show leniency to Mr. McKinzie. *And since none*

*of those factors apply, you have less reason to show him leniency.*" While "[a] prosecutor may not argue that lack of evidence of a mitigating factor may be considered by the jury as a factor in aggravation" (*People v. Panah* (2005) 35 Cal.4th 395, 496), the record does not suggest that the prosecutor was arguing that lack of mitigation constituted an aggravating circumstance. The prosecutor made the highlighted comments during his discussion of potential mitigating factors and before his discussion of section 190.3, factor (k), the catchall mitigating circumstance. The prosecutor could reasonably point out to the jury that certain mitigating factors did not apply on the present facts and that such factors therefore could not be used to show defendant leniency. The prosecutor's "discussion of the lack of evidentiary support for the factors in mitigation was entirely proper." (*Panah, supra,* 35 Cal.4th at p. 497; see *People v. Millwee* (1998) 18 Cal.4th 96, 152-153 [rejecting similar claim] (*Millwee*).)

Finally, defendant contends that the prosecutor improperly argued to the jury nonstatutory factors in aggravation. At the end of his first jury summation, the prosecutor concluded with a quote from "an old English jurist, Lord Justice Denny" as follows: " 'Punishment is the way in which society expresses its denunciation of wrongdoing. In order to maintain respect for the law, it is essential that punishment inflicted for grave crimes should adequately reflect the revulsion felt by the majority of citizens for those crimes. The truth is that some cases are so outrageous that society insists on adequate punishment because the wrongdoer deserves it.' " Defendant suggests "revulsion felt by the majority of citizens" is not a proper aggravating circumstance. The prosecutor has wide latitude to argue that, based upon the evidence presented, the death penalty is the proper punishment commensurate with defendant's crime. The prosecutor's argument "was nothing more than reasonable commentary on the evidence presented and a call to vote for death based on that evidence." (*People v. Brady* (2010) 50 Cal.4th 547, 584 [prosecutor's argument that " '[t]his is a case where society cries out for the death penalty' " and the jurors were " 'the conscience of society' " not improper]; see *Marlow,*

*supra,* 34 Cal.4th at p. 152 [prosecutor's argument that the defendant " 'crossed the line' " " 'where we as a society say enough' " not improper]; *People v. Johnson* (1992) 3 Cal.4th 1183, 1246-1247 [argument that jurors were " 'protectors of society from enemies within' " not improper].)

Defendant also suggests that the prosecutor relied upon other nonstatutory aggravating factors such as defendant's attempt during the guilt phase of the trial to blame another for his crimes. The record shows that the prosecutor made this point to emphasize that defendant's claimed remorse at the penalty phase was not sincere and that defendant's version of events, in which he claimed he did not strangle the victim and the victim fell into the ditch where her body was discovered, should not be believed. Both points were properly made. (See *People v. Holloway* (2004) 33 Cal.4th 96, 144-145 [prosecutor could properly inquire about defendant's false testimony at the guilt phase to rebut the defendant's claim of remorse].)

## 2. Admission of Photographs

Defendant argues that the admission of crime scene and autopsy photographs during the penalty phase — the same photographs admitted at the guilt phase — deprived him of a reliable penalty determination. The claim lacks merit. "As a general rule, a trial court has broad discretion to determine the admissibility of a photograph challenged as unduly gruesome or inflammatory, and we will not disturb its determination on appeal unless the photograph's prejudicial effect clearly outweighs its probative value." (*Taylor*, *supra*, 48 Cal.4th at p. 649.) "A trial court has broader discretion to admit photographic evidence of the crime at the penalty phase than at the guilt phase. 'This is so because the prosecution has the right to establish the circumstances of the crime, including its gruesome consequences [citation], and because the risk of an improper guilt finding based on visceral reactions is no longer present.' [Citation.]" *(Mills, supra,* 48 Cal.4th at p. 205.) Here, the crime scene and autopsy photographs were "highly relevant to the circumstances of the crimes. ([§ 190.3, factor (a) . . . ].) They disclosed the manner in

which the victim[] died and substantiated that defendant intended and deliberated the murder[]. [Citations.] They demonstrated the callousness and cruelty of defendant's acts." (*Solomon, supra,* 49 Cal.4th at p. 842.) Indeed, the photographic evidence was critical to rebut defendant's penalty phase testimony denying that he had strangled the victim and his claim that the victim fell into the ditch. Further, as discussed (see *ante,* at pp. 54-56), the photos were "neither unduly gruesome nor inflammatory and 'not of such a nature as to overcome the jury's rationality.' [Citation.]" (*Taylor, supra,* 48 Cal.4th at p. 650; see *Mills, supra,* 48 Cal.4th at pp. 204-205 [rejecting claim that autopsy photos should not have been admitted at the penalty phase]; *People v. Loker* (2008) 44 Cal.4th 691, 705 [same]; *Carey, supra,* 41 Cal.4th at p. 129 [same].)

3. Instructional Issues

(a) Instructions Regarding Sentencing Discretion

Defendant raises various challenges to a modified version of CALJIC No. 8.88 (Penalty Trial — Concluding Instruction), which described to the jury how to determine the appropriate penalty. He first contends that the phrase "so substantial" in the following sentence is too vague and ambiguous, and provides insufficient guidance to the jury: "To return a judgment of death, each of you must be persuaded that the aggravating circumstances are *so substantial* in comparison with the mitigating circumstances that it warrants death instead of life without parole." (Italics added.) We have repeatedly rejected the claim, explaining that "these words 'plainly convey the importance of the jury's decision and emphasize that a high degree of certainty is required for a death verdict.' " (*Jackson, supra,* 13 Cal.4th at p. 1243; see *Mendoza, supra,* 52 Cal.4th at p. 1097 [rejecting same claim]; *Hartsch, supra,* 49 Cal.4th at p. 516 [same].)

Defendant next argues that CALJIC No. 8.88 should have instructed the jury to find whether the death penalty was "appropriate," not whether that penalty was "warrant[ed]." The claim lacks merit because the instruction did refer on two occasions to whether the death penalty was appropriate. First, the instruction stated that a

67

mitigating circumstance "may be considered as an extenuating circumstance in determining the appropriateness of the death penalty." Second, in the sentence just prior to the one containing the word "warrants," the instruction stated: "In weighing the various circumstances you determine under the relevant evidence which penalty is *justified and appropriate* by considering the totality of the aggravating circumstances with the totality of the mitigating circumstances." (Italics added.) In this context, the instruction properly conveyed to the jury that circumstances "warrant[]" the death penalty when such punishment is appropriate in the eyes of the jury. (See *People v. Breaux* (1991) 1 Cal.4th 281, 316 ["Essentially, the jury was told that it could return a death verdict only if aggravating circumstances predominated and death is the appropriate verdict."]; see also *Mendoza, supra,* 52 Cal.4th at p. 1097 [rejecting same claim]; *People v. McKinnon* (2011) 52 Cal.4th 610, 693 [same] (*McKinnon*); *People v. Lee* (2011) 51 Cal.4th 620, 652 [same] (*Lee*).)

Defendant asserts that CALJIC No. 8.88 was defective for failing to tell the jury that if mitigating circumstances outweighed aggravating circumstances, then the jury must sentence defendant to a term of life without possibility of parole. "[S]uch an admonishment was unnecessary in light of the express instruction that a death verdict could be entered only if aggravating circumstances outweighed mitigating ones." (*People v. Medina* (1995) 11 Cal.4th 694, 782; see *People v. Ray* (1996) 13 Cal.4th 313, 356 ["By stating that death *can* be imposed in only one circumstance—where aggravation substantially outweighs mitigation—the instruction clearly implies that a sentence less than death *may* be imposed in all other circumstances."] (*Ray*); see also *Dement, supra,* 53 Cal.4th at p. 56; *Mendoza, supra,* 52 Cal.4th at p. 1097.)

Finally, defendant claims that CALJIC No. 8.88 should have informed the jury that he did not have the burden of persuading the jury that death was not an appropriate penalty. "Implicit in the sentencing instructions is that the determination of penalty is 'essentially moral and normative . . . , and therefore . . . there is no burden of proof or

68

burden of persuasion.  [Citation.]'  [Citation.]"  (*Cook, supra,* 40 Cal.4th at p. 1368 [rejecting same claim]; see *People v. Morgan* (2007) 42 Cal.4th 593, 626 [same].)

(b) Refusal of Proposed Defense Instructions

Defendant contends that the trial court erred by refusing to give three jury instructions proposed by the defense.  He first argues that the trial court should have given defense special instruction No. 5, which would have identified certain factors enumerated in CALJIC No. 8.85 (Penalty Trial — Factors for Consideration) as either aggravating or mitigating.  We have previously rejected similar claims, noting "the aggravating and/or mitigating nature of the various factors is readily apparent without such labels, even in the face of contrary argument."  (*Millwee, supra,* 18 Cal.4th at p. 163.)  So long as the instructions "focus the sentencer's consideration on 'specific, provable, and commonly understandable facts' that properly bear on the appropriate penalty, they cannot be deemed unconstitutionally vague 'simply because they leave the sentencer free to evaluate the evidence in accordance with his or her own subjective values.'  [Citation.]"  (*People v. Montiel* (1993) 5 Cal.4th 877, 945 [addressing section 190.3's failure to identify which factors are aggravating or mitigating]; see *People v. Burney* (2009) 47 Cal.4th 203, 260-261 [CALJIC No. 8.85 not defective for failing to identify factors as aggravating or mitigating]; *Dykes, supra,* 46 Cal.4th at p. 814 [same].)

Defendant suggests that the trial court's failure to identify particular circumstances pertaining to his background and character as mitigating precluded the jury from considering those factors as mitigating circumstances.  He observes that CALJIC No. 8.88 defined a mitigating circumstance as "any fact, condition or event which does not constitute a justification or excuse for the crime in question, but may be considered as an extenuating circumstance in determining the appropriateness of the death penalty."  CALJIC No. 8.85 informed the jury that it may consider "[a]ny other circumstance which extenuates, which means lessens, the gravity of the crime even though it is not a legal excuse for the crime and any sympathetic or other aspect of the defendant's character or

69

record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial." (See also § 190.3, factor (k).)

Defendant argues that these instructions, in combination, precluded the jury from considering sympathetic evidence of his background because they defined a "mitigating circumstance" in reference to an "extenuating circumstance," which necessarily only encompasses the facts of the offenses. The claim lacks merit. Contrary to defendant's contention, CALJIC No. 8.88 did not preclude the jury from considering defendant's background as a mitigating circumstance because a "fact, condition or event" which "may be considered as an extenuating circumstance" within the meaning of CALJIC No. 8.88 reasonably may also include a "defendant's character" as identified in CALJIC No. 8.85. Further, the modified version of CALJIC No. 8.88 given to the jury here specifically told the jury that "[t]he law permits you to consider sympathy for the defendant which is based on the evidence you have heard" and may consider "the effect of this case on defendant's family insofar as it illuminates positive qualities of the defendant's background or character." Considered as a whole, there is little doubt the given instructions conveyed to the jury that it could consider any relevant sympathetic aspect of defendant's background as a mitigating circumstance. (See *People v. Carter* (2003) 30 Cal.4th 1166, 1228-1229 [trial court properly refused a defense instruction "that any aspect of defendant's background or character could be considered as a mitigating factor"].)

Defendant next claims that the trial court should have given defense special instruction No. 14, which would have identified several pieces of evidence and told the jury they could be considered as mitigating circumstances. The instruction identified the following evidence: "Defendant's voluntary confession to the crime, his sorrow for his crime, . . . his acceptance of responsibility for his crime," "[d]efendant's drug addiction," "[d]efendant's care and love for his children and step-children," and "[d]efendant's behavior in county jail while awaiting trial." "The trial court can properly refuse as

70

argumentative an instruction that identifies particular evidence as mitigating." (*Guerra, supra,* 37 Cal.4th at p. 1150.) A defendant " 'ha[s] a "right to an instruction that 'pinpoint[s] the *theory* of the defense.' " ' [Citation.] The instruction here did not do so." (*People v. Benson* (1990) 52 Cal.3d 754, 806 [rejecting same claim].)

Finally, defendant argues that the trial court should have given defense special instruction No. 7, which would have told the jury it could impose a sentence of life without possibility of parole even if it found no mitigating circumstances. The claim fails because "under the language of CALJIC No. 8.88, 'no reasonable juror would assume he or she was required to impose death despite insubstantial aggravating circumstances, merely because no mitigating circumstances were found to exist.' " (*People v. Perry* (2006) 38 Cal.4th 302, 320; see *People v. Seaton* (2001) 26 Cal.4th 598, 688; *Ray, supra,* 13 Cal.4th at pp. 355-356.)

(c) Written Findings

Defendant contends that failing to require jurors to make written findings regarding aggravating factors they found true deprived him of due process and equal protection and also precludes meaningful appellate review. We have repeatedly rejected such a claim, finding that "[n]othing in the federal Constitution requires the penalty phase jury to make written findings of the factors it finds in aggravation" (*People v. Scott* (2011) 52 Cal.4th 452, 496) and that "[t]he trial court's failure to require the jury to make written findings regarding the aggravating factors it found under CALJIC No. 8.85 does not preclude meaningful appellate review" (*McKinnon, supra,* 52 Cal.4th at p. 693). "The high court's decisions interpreting the Sixth Amendment right to jury trial (*Ring v. Arizona* (2002) 536 U.S. 584; *Apprendi v. New Jersey* (2000) 530 U.S. 466) do not require otherwise." (*Clark, supra,* 52 Cal.4th at p. 1007; see also *Garcia, supra,* 52 Cal.4th at p. 764; *Gonzales, supra,* 52 Cal.4th at p. 333; *People v. Thomas* (2011) 52 Cal.4th 336, 364-365; *Bivert, supra,* 52 Cal.4th at pp. 123-124; *Virgil, supra,* 51 Cal.4th at p. 1289.) Defendant's arguments do not call our prior decisions into question.

(d) Inapplicable Mitigating Factors

Defendant contends that the trial court should have modified CALJIC No. 8.85 to delete mitigating factors that did not apply to his case. He argues that the failure to do so allowed the jury to interpret the absence of any such mitigating factor as an aggravating factor. Defendant acknowledges that CALJIC No. 8.85 instructed the jury to consider various factors "if applicable." "[T]here is no error in the trial court's failure to delete as inapplicable mitigating factors . . . if the jury, as in this case, was properly instructed to consider and be guided by all the factors ' "if applicable," ' since 'we assume the jury properly followed the instruction and concluded that mitigating factors not supported by evidence were simply not "applicable." ' [Citations.]" (*Maury, supra,* 30 Cal.4th at pp. 439-440; see *Mendoza, supra,* 52 Cal.4th at p. 1097; *Gonzales, supra,* 52 Cal.4th at p. 334; *People v. Castaneda* (2011) 51 Cal.4th 1292, 1348 (*Castaneda*); *Thomas, supra,* 51 Cal.4th at pp. 505-506.)

4. Death Penalty as "Regular" Punishment

Defendant argues that imposition of the death penalty as a "regular punishment for substantial numbers of crimes" is contrary to "international norms of human decency" and violates the Eighth Amendment's ban on cruel and unusual punishment. "Defendant's argument . . . fails, at the outset, because California does not employ capital punishment in such a manner. The death penalty is available only for the crime of first degree murder, and only when a special circumstance is found true; furthermore, administration of the penalty is governed by constitutional and statutory provisions different from those applying to 'regular punishment' for felonies." (*People v. Demetrulias* (2006) 39 Cal.4th 1, 43-44; see *Clark, supra,* 52 Cal.4th at p. 1008; *People v. Famalaro* (2011) 52 Cal.4th 1, 44; *Castaneda, supra,* 51 Cal.4th at p. 1356; *Lee, supra,* 51 Cal.4th at p. 654; *Thomas, supra,* 51 Cal.4th at p. 507.)

72

5. Intercase Proportionality Review

Defendant contends that the Eighth Amendment requires intercase proportionality review to protect against arbitrary or capricious imposition of the death penalty. He also suggests that failure to conduct such a review violates his rights to due process and equal protection. Defendant acknowledges that the United States Supreme Court has found the Eighth Amendment does not require "comparative proportionality review by an appellate court . . . in every case in which the death penalty is imposed and the defendant requests it." (*Pulley v. Harris* (1984) 465 U.S. 37, 50-51.) We have thus concluded that "intercase proportionality review, also known as comparative proportionality review, is not required to render California's sentencing scheme constitutional" and that "the equal protection clause does not require California to include in its capital sentencing scheme the same disparate sentence review previously provided noncapital convicts under the Determinate Sentencing Act." (*Gamache, supra,* 48 Cal.4th at p. 407; see *Castaneda, supra,* 51 Cal.4th at p. 1356; *Lee, supra,* 51 Cal.4th at p. 651; *Howard, supra,* 51 Cal.4th at p. 39; *People v. Foster* (2010) 50 Cal.4th 1301, 1368.) Although defendant suggests that *Pulley* should be "reevaluated," the high court has stated that "[i]f a precedent of this Court has direct application in a case," the lower court "should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." (*Rodriguez de Quijas v. Shearson/American Express, Inc.* (1989) 490 U.S. 477, 484.) In any event, defendant provides no persuasive reason for reconsidering *Pulley* or our prior decisions.

6. Constitutionality of the Death Penalty Statute

Defendant contends that failing to require the jury to find beyond a reasonable doubt (1) the existence of aggravating factors, (2) that aggravating factors outweigh mitigating factors, and (3) that death is the appropriate penalty deprives him of due process and equal protection. Defendant relies upon *Apprendi v. New Jersey, supra,* 530 U.S. 466, and *Ring v. Arizona, supra,* 536 U.S. 584. Under *Apprendi,* "[o]ther than the

73

fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." (*Apprendi, supra,* 530 U.S. at p. 490.)  *Ring* applied *Apprendi* in striking down Arizona's death penalty procedure in which a jury convicted a defendant of murder with special circumstances but a judge without a jury found at least one aggravating circumstance required to impose the death penalty:  "Because Arizona's enumerated aggravating factors operate as 'the functional equivalent of an element of a greater offense,' [citation], the Sixth Amendment requires that they be found by a jury." (*Ring*, *supra*, 536 U.S. at p. 609, quoting *Apprendi*.)

We have previously rejected this claim, noting that our death penalty statute differs from the one at issue in *Ring*:  "Under the Arizona capital sentencing scheme invalidated in *Ring,* a defendant convicted of first degree murder could be sentenced to death if, and only if, the trial court first found at least one of the enumerated aggravating factors true.  [Citation.]  Under California's scheme, in contrast, each juror must believe the circumstances in aggravation substantially outweigh those in mitigation, but the jury as a whole need not find any one aggravating factor to exist.  The final step in California capital sentencing is a free weighing of all the factors relating to the defendant's culpability, comparable to a sentencing court's traditionally discretionary decision to, for example, impose one prison sentence rather than another.  Nothing in *Apprendi* or *Ring* suggests the sentencer in such a system constitutionally must find any aggravating factor true beyond a reasonable doubt." (*Snow*, *supra*, 30 Cal.4th at p. 126, fn. 32.)  Further, " ' " '[u]nlike the guilt determination, "the sentencing function is inherently moral and normative, not factual" . . . and, hence, not susceptible to a burden-of-proof quantification.' " [Citation.]' [Citation.]" (*Virgil, supra,* 51 Cal.4th at p. 1278; see also *Dement, supra,* 53 Cal.4th at p. 55 [rejecting same claim]; *Mendoza, supra,* 52 Cal.4th at p. 1096 [same].)

We have also made a similar observation in rejecting defendant's claim that the prosecution bore the burden of persuasion during the penalty phase: "Because the decision whether to sentence a defendant to death is essentially a normative one, we have held the prosecution bears no burden of persuasion in the penalty phase." (*Virgil, supra,* 51 Cal.4th at p. 1289; see *Bivert, supra,* 52 Cal.4th at pp. 123-124 [rejecting same claim]; *Castaneda, supra,* 51 Cal.4th at p. 1355 [same].) Defendant provides no persuasive argument calling these authorities into question.

7. Determinate Sentencing Issues

Defendant contends that the trial court's imposition of upper term sentences for robbery in count 2 and carjacking in count 4 violated his jury trial right because the trial court found aggravating circumstances that increased his punishment but were not necessarily found by the jury. As defendant observes, the United States Supreme Court struck down the former Determinate Sentencing Law (see former § 1170), which was in effect at the time of the present sentencing, concluding that "[b]ecause the [Determinate Sentencing Law] authorizes the judge, not the jury, to find the facts permitting an upper term sentence, the system cannot withstand measurement against our Sixth Amendment precedent." (*Cunningham v. California* (2007) 549 U.S. 270, 293.) Notwithstanding *Cunningham,* we have noted that "so long as a defendant is *eligible* for the upper term by virtue of facts that have been established consistently with Sixth Amendment principles, the federal Constitution permits the trial court to rely upon any number of aggravating circumstances in exercising its discretion to select the appropriate term by balancing aggravating and mitigating circumstances, regardless of whether the facts underlying those circumstances have been found to be true by a jury." (*People v. Black* (2007) 41 Cal.4th 799, 813.) *Black* observed that a "defendant's criminal history" may render a defendant eligible for an upper term sentence and that "[t]he United States Supreme Court consistently has stated that the right to a jury trial does not apply to the fact of a

75

prior conviction." (*Id*. at p. 818; see *Cunningham, supra,* 549 U.S. at pp. 288-289; *Apprendi, supra,* 530 U.S. at p. 490.)

As relevant here, the probation officer's report, which was considered by the trial court, cited as a circumstance in aggravation that defendant "has an extensive prior record of criminal conduct which spans nearly 30 years." (See Cal. Rules of Court, rule 4.421(b)(2) [aggravating circumstance includes that "prior convictions as an adult . . . are numerous or of increasing seriousness"].) In addition to numerous juvenile dispositions and adult drug convictions, the probation officer's report noted defendant's prior adult convictions included a 1979 attempted residential burglary and a 1983 attempted robbery. The report also observed that defendant had served two prior prison terms and two prior commitments to the former California Youth Authority, had previously violated parole, and was on parole at the time of his present offenses. (See Cal. Rules of Court, rule 4.421(b)(3)-(5).) In addition to finding that the victim was particularly vulnerable and that defendant's offenses involved great violence, the trial court noted "the defendant's attempted robbery of an elderly woman outside a bank in 1983," which also involved violence. Under the reasoning of *People v. Black, supra,* 41 Cal.4th 799, defendant's recidivism made him eligible for an upper term sentence, and the trial court's additional factfinding did not violate defendant's Sixth Amendment jury trial right. (See also *People v. Towne* (2008) 44 Cal.4th 63, 81 ["a trial court's conclusion that the charged offense was committed while the defendant was on probation or parole, like a finding of a prior conviction, does not require judicial factfinding regarding the charged offense"].)

Defendant next contends that the trial court violated section 654 by imposing consecutive terms for burglary in count 3, carjacking in count 4, and kidnapping for robbery in count 5. "At the time of trial, section 654 provided in pertinent part: 'An act or omission which is made punishable in different ways by different provisions of this code may be punished under either of such provisions, but in no case can it be punished under more than one . . . .' (Former § 654, as amended by Stats. 1977, ch. 165, § 11,

p. 644.)  Section 654 bars multiple punishment for separate offenses arising out of a single occurrence where all of the offenses were incident to one objective.  (*Neal v. State of California* (1960) 55 Cal.2d 11, 19.)"  (*Lewis, supra,* 43 Cal.4th at p. 519.)  " ' "A trial court's implied finding that a defendant harbored a separate intent and objective for each offense will be upheld on appeal if it is supported by substantial evidence."  [Citation.]' [Citation.]"  (*People v. Sanchez* (2009) 179 Cal.App.4th 1297, 1310; see *People v. Racy* (2007) 148 Cal.App.4th 1327, 1336-1337.)

Substantial evidence supported the trial court's implicit finding that defendant harbored multiple objectives in committing burglary and either carjacking or kidnapping. As the Attorney General observes, the prosecutor made an election during jury argument at the guilt phase that the burglary charge in count 3 was based upon defendant's entry into Avril's apartment to take items from within and not, as defendant asserts, upon defendant's initial entry into Avril's garage that led to the physical confrontation between them.  (See *People v. Russo* (2001) 25 Cal.4th 1124, 1132 ["when the evidence suggests more than one discrete crime, either the prosecution must elect among the crimes or the court must require the jury to agree on the same criminal act"].)  The trial court could reasonably find that this later entry, which occurred sometime after defendant took the victim to a remote location and dumped her body, was done with an objective different from the taking of Avril's car, which was the basis of the carjacking and kidnapping counts.  (See *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1163 [§ 654 did not preclude punishment for both burglary and kidnapping].)

The Attorney General concedes, however, that defendant could not be punished for both carjacking and kidnapping for robbery because the prosecutor argued to the jury that the victim's car was the object of the robbery.  (See *Lewis, supra,* 43 Cal.4th at p. 519 ["Here, the kidnappings for robbery and the robberies of each victim were committed 'pursuant to a single intent or objective,' that is, to rob the victims of their cars and/or cash from their bank accounts."]; *People v. Beamon* (1973) 8 Cal.3d 625, 639

77

[§ 654 precluded punishment for both "kidnapping for the purpose of robbery and for the commission of that very robbery"].)  The trial court thus should have stayed the sentence on the carjacking count pursuant to section 654.  (Cf. *People v. Navarro* (2007) 40 Cal.4th 668, 681.)

Lastly, defendant contends that any factfinding engaged in by the trial court in justifying consecutive sentences violated his right to a jury trial.  Both the United States Supreme Court and this court have rejected the claim.  "The decision to impose sentences consecutively is not within the jury function that 'extends down centuries into the common law.'  [Citation to *Apprendi*.]  Instead, specification of the regime for administering multiple sentences has long been considered the prerogative of state legislatures."  (*Oregon v. Ice* (2009) 555 U.S. 160, 168.)  Similarly, "[t]he determination whether two or more sentences should be served [consecutively] is a 'sentencing decision[] made by the judge after the jury has made the factual findings necessary to subject the defendant to the statutory maximum sentence on each offense' and does not 'implicate[] the defendant's right to a jury trial on facts that are the functional equivalent of elements of an offense.'  [Citation.]"  (*People v. Black, supra,* 41 Cal.4th at p. 823.)

8. Cumulative Error

Defendant contends that cumulative error deprived him of a fair penalty trial.  Because there were no identified errors during the penalty phase, defendant could not have suffered prejudice from cumulative error.  (*People v. Alfaro* (2007) 41 Cal.4th 1277, 1316; *People v. Abilez* (2007) 41 Cal.4th 472, 523.)

## CONCLUSION

The judgment is modified to reflect a stay pursuant to Penal Code section 654 with respect to count 4, carjacking (Pen. Code, § 215, subd. (a)).  As modified, the judgment is affirmed.

LIU, J.


WE CONCUR:   CANTIL-SAKAUYE, C. J.
KENNARD, J.
BAXTER, J.
WERDEGAR, J.
CHIN, J.
CORRIGAN, J.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. McKinzie

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S081918
**Date Filed:** August 2, 2012

_____

**Court:** Superior
**County:** Ventura
**Judge:** Vincent J. O'Neill

_____

**Counsel:**

Gregory L. Cannon, under appointment by the Supreme Court, for Defendant and Appellant.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Joseph P. Lee and Eric E. Reynolds, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Gregory L. Cannon
Cannon & Harris
6046 Cornerstone Court West, Suite 141
San Diego, CA  92121-4733
(619) 392-2936

Eric E. Reynolds
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA  90013
(213) 897-2868